**In re CENTRAL R. CO. OF NEW JERSEY.**

**ORDER OF RAILWAY CONDUCTORS OF AMERICA et al. v. PITNEY et al.**

**No. 8556.**

Circuit Court of Appeals, Third Circuit.
Argued June 20, 1944.
Decided Sept. 25, 1944.

Rehearing Denied Nov. 16, 1944.

V. C. Shuttleworth, of Cedar Rapids, Iowa (Carpenter, Gilmour & Dwyer, and Carl S. Kuebler, all of Jersey City, N.J., on the brief), for appellant.

John J. McElhinny, of New York City (Howard L. Kern, of New York City, on the brief), for Trustees of Central R. Co.

Harry Lane, of Jersey City, N.J. (Carey & Lane, of Jersey City, N. J., on the brief), for intervenor-respondent.

Before BRATTON* and GOODRICH, Circuit Judges, and KIRKPATRICK, District Judge.

BRATTON, Circuit Judge.

Central Railroad Company of New Jersey is in process of reorganization under Section 77 of the Bankruptcy Act, as amended, 11 U.S.C.A. § 205. The reorganization proceeding is pending in the United States Court for New Jersey. Order of Railway Conductors of America, hereinafter called O.R.C., is the accredited representative under the Railway Labor Act, as amended, 45 U.S.C.A. § 151 et seq., of road conductors in the service of the company. Brotherhood of Railroad Trainmen, hereinafter referred to as B.R.T., **is**

---

* By assignment.

the accredited representative of yard conductors in the service of the company in the New York Harbor Terminal Territory. The O.R.C. filed in the reorganization proceeding a petition seeking to restrain the trustees of the carrier from manning with yard conductors five daily freight trains or services commonly called the Bayway and Standard Oil drills. It was alleged in the petition that for some time past road conductors had manned the drills under the rules, rates of pay, and working conditions negotiated by and between O.R.C. and the carrier; that it was the intention of the carrier to displace road conductors on such drills with yard conductors; and that no notice of the intended change had been given as required by Section 6 of the Railway Labor Act. The trustees answered, and B.R.T. intervened. The matter was referred to a master. The master took testimony and submitted an intermediate report and a final report. The court entered an order determining that yard conductors were entitled to man the drills in question, and dismissing the petition. The appeal is from that order.

Taking up the question of jurisdiction of the court, subdivision a of Section 77, supra, 11 U.S.C.A. § 205a, provides that if the petition for reorganization is approved the court "shall have and may exercise in addition to the powers conferred by this section all the powers * * * which a Federal court would have had if it had appointed a receiver in equity of the property of the debtor for any purpose." It is clear that if this provision stood alone, a court in which a proceeding for reorganization is pending would have jurisdiction to determine a controversy of this kind between two groups of conductors, and to direct the trustees accordingly. But subsection n provides that in proceedings under the section, no judge or trustee acting under the Act shall change the wages or working conditions of railroad employees except in the manner prescribed in the Railway Labor Act, as amended, or as it may be amended. Section 2 of the Railway Labor Act, as amended, 45 U.S.C.A. § 152, provides that a carrier shall not change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements, except in the manner prescribed in such agreements or in Section 6 of the Act. And Section 6, 45 U.S.C.A. § 156, provides that carriers and representatives of employees shall give at least thirty days written notice of an intended change in agreements affecting rates of pay, rules, or working conditions; that the time and place for the beginning of conference between representatives of the parties in interest shall be agreed upon within ten days after receipt of the notice; that such time shall be within the thirty days provided in the notice; and that in every case where the notice has been given, or conferences are being held, or the services of the Mediation Board have been requested, or the Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon by the Board, unless a period of ten days has elapsed after termination of the conferences without request for or proffer of the services of the Board. The Act contains many other provisions not necessary to outline in detail.

The history of the legislation in relation to the settlement of railway labor disputes, and the continued Congressional policy of encouraging the amicable adjustment of such disputes, manifested by the enactment of the Railway Labor Act, has been adequately reviewed and need not be repeated or recapitulated here. Texas & New Orleans Railroad Co. v. Brotherhood of Railway & Steamship Clerks, 281 U.S. 548, 50 S.Ct. 427, 74 L.Ed. 1034; Virginian Railway Co. v. System Federation Railway Employees, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789; Moore v. Illinois Central Railroad Co., 312 U.S. 630, 61 S.Ct. 754, 85 L.Ed. 1089; Switchmen's Union v. National Mediation Board, 320 U.S. 297, 64 S.Ct. 95; General Committee of Adjustment v. Missouri-Kansas-Texas Railroad Co., 320 U.S. 323, 64 S.Ct. 146; General Committee of Adjustment v. Southern Pacific Co., 320 U.S. 338, 64 S.Ct. 142; Brotherhood of Railroad Trainmen v. Toledo, Peoria & Western Railroad, 321 U.S. 50, 64 S.Ct. 413, 150 A.L.R. 810.

In this case, each Brotherhood has in force a basic agreement with the carrier relating to rates of pay, rules, and working conditions; and each craft of conductors involved in the controversy maintains its own seniority roster. The thirty-day notice required by Section 6 of the Railway Labor Act of an intended change in rates of pay, rules, or working conditions was not given, and no effort was made to proceed in the manner prescribed by the Act.

If road conductors should be displaced on the five drills in question, in contravention or their basic agreement, the volume of work available for members of that craft would be curtailed by that amount, and in the event of a sufficient diminution in business of the carrier those lowest on the roster would that much sooner be assigned to other runs, or be temporarily demoted to service as brakemen, or be without employment. And at the same time yard conductors would gain advantage in inverse order. Therefore the proposed displacement of road conductors with yard conductors did involve a change in working conditions, within the sweep of the Railway Labor Act. And the remedy prescribed by the Act was exclusive. Switchmen's Union v. National Mediation Board, supra; General Committee of Adjustment v. Missouri-Kansas-Texas Railroad Co., supra; General Committee of Adjustment v. Southern Pacific Co., supra.

■ Reliance is placed upon Section 24(8) of the Judicial Code, 28 U.S.C.A. § 41(8) to sustain jurisdiction. The section vests in the district courts jurisdiction of all suits and proceedings arising under any law regulating commerce. That is a broad grant of general jurisdiction, and it does not have application in a case of this kind where Congress has made specific provision for the protection of the right which it created. Switchmen's Union v. National Mediation Board, supra. We think the petition failed to submit any right which was presently appropriate for protection or enforcement by judicial decree.

■ But if we should be mistaken in respect of the lack of jurisdiction, the road conductors are not entitled to prevail on the merits. The right of a carrier to establish switching boundaries of yards is conceded. In 1929, the carrier fixed the switching boundaries of the Elizabethport yard, and both Brotherhoods expressed in writing their concurrence. Morse's Creek was designated as the southerly boundary of the switching limits, and these five drills are within the switching boundaries of the Elizabethport yard. The purpose of establishing the boundaries of the yard was to fix a line of demarcation between road service and yard service. It was to designate a line beyond which yard conductors should not go, and inside of which road conductors should not work, except in cases of emergency. But despite the establishment of the yard limits, there was a certain amount of overlapping. Among other instances, road conductors manned the five drills in question, and yard conductors manned certain transfer runs which extended south of Morse's Creek and therefore outside of the switching limits of the yard. The O.R.C. protested against yard conductors manning the transfer runs south of Morse's Creek, contending that the work belonged to road conductors. As the result, the carrier and O.R.C. entered into an agreement in 1940 which provided that after a certain date road conductors should perform all service south of Morse's Creek on the Perth Amboy Branch. The B.R.T. was not a party to that agreement. When yard conductors were displaced with road conductors on the transfer runs, B. R. T. urged that road conductors be taken off the Bayway and Standard Oil drills. In consequence, the carrier and B.R.T. entered into an agreement in 1943 which provided that effective on a certain date yard conductors should man the Bayway and Standard Oil drills. The O.R.C. was not a party to that agreement. Since the carrier and both Brotherhoods did not join in either of these two agreements, neither of them operated to take from the Brotherhood not a party to it and vest in the other any rights created by the basic collective bargaining agreements, or the rights arising out of the establishment of the limits of the Elizabethport yard. There is no basis for the contention that road conductors have the right to man these drills which lie within the switching limits of the yard.

The order appealed from is vacated, the proceeding is remanded for dismissal without prejudice to any action or proceeding not in conflict with the Railway Labor Act, as amended, and the costs are taxed against O.R.C.