ORDER OF RAILWAY CONDUCTORS OF AMERICA
ET AL. *v.* PITNEY ET AL., TRUSTEES OF CENTRAL
RAILROAD CO. OF NEW JERSEY, ET AL.

No. 37.   Argued November 9, 1945.—Decided January 14, 1946.

Mr. V. C. Shuttleworth, with whom Messrs. Carl S. Kuebler, Rufus G. Poole and Milton C. Denbo were on the brief (Mr. James D. Carpenter, Jr. entered an appearance), for petitioners.

Mr. Richard J. Lally, with whom Mr. Howard L. Kern was on the brief, for the Trustees; and Mr. Harry Lane, with whom Mr. Robert Carey was on the brief, for the Brotherhood of Railroad Trainmen et al., respondents.

MR. JUSTICE BLACK delivered the opinion of the Court.

This case requires us to consider to what extent a Federal District Court having charge of a railroad reorganization has power to adjudicate a jurisdictional dispute involving the railroad and two employee accredited bargaining agents in view of the provisions in the Railway Labor Act, 45 U. S. C. § 151 et seq., giving such power to the administrative agencies established thereunder. Each union claims that its respective collective bargaining agreement entitles it to supply conductors for five daily freight trains operated within the Elizabethport, New Jersey, yards of the railroad and both pressed their contentions on the reorganization trustees appointed under the provisions of § 77 of the Bankruptcy Act. 11 U. S. C. § 205. The two unions are the Order of Railway Conductors (O. R. C.), which represents road conductors who ordinarily operate trains outside the yards, and the Brotherhood of Railroad Trainmen (B. R. T.), which represents yard conductors who ordinarily operate trains inside the yards. But here, the practice over a period of years had been that at times yard conductors manned some trains outside the yard and road conductors manned some trains

within the yard, including the five freight trains here involved. In 1940 the railroad in response to pressure by the O. R. C. agreed that thereafter only road conductors would man the outside trains. However, O. R. C. conductors continued to operate the five daily freight trains within the yard. In 1943 the railroad was prevailed upon by the B. R. T. to agree to substitute B. R. T. yard conductors for the O. R. C. conductors operating these five trains.

Thereupon O. R. C. brought this suit in the reorganization court. It alleged that its members had for the past 35 years operated the trains in issue as a result of negotiations as to rules, rates of pay and working conditions between it and the railroad and that the 1940 contract specifically provided that this situation would not be changed without further agreement. Thus, the proposed displacement of O. R. C. conductors would violate § 6 of the Railway Labor Act which makes it unlawful for a carrier or employee representatives to change "pay, rules, or working conditions," unless 30 days written notice of the intended change shall have been given and the controversy has been finally acted upon by the Mediation Board.[1] The O. R. C. asked the court to instruct its

---

[1] "Sec. 6. Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice. In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon as required by section 5 of this Act, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board."

trustees not to displace road conductors and to enjoin them permanently from taking such action so long as O. R. C.'s contracts with the road were not altered in accordance with the provisions of the Railway Labor Act.

Answers were filed by the trustees and the B. R. T. as intervenor. The case was referred to a Master who, after a hearing, found that O. R. C.'s collective bargaining contracts did not provide that its conductors were to operate the five freight trains and that the B. R. T. contract allotted these lines to its members. The District Court sustained these findings and accordingly dismissed the petition on the merits. The Circuit Court of Appeals held that the petition should be dismissed on jurisdictional grounds because it thought that the remedies of the Railway Labor Act for the settlement of disputes such as here involved are exclusive. 145 F. 2d 351. It further stated that if it should be mistaken on the jurisdictional question, then it agreed with the District Court that the road conductors must lose on the merits.

Section 77 (n) of the Bankruptcy Act provides that "No judge or trustee acting under this Act shall change the wages or working conditions of railroad employees, except in the manner prescribed in the Railway Labor Act . . ." 49 Stat. 923. Section 1 of the Railway Labor Act defines a carrier, subject to it, as including "any receiver, *trustee*, or *other individual or body, judicial* or otherwise, when in *the possession of the business of any such 'carrier'* . . ." And § 2, Seventh, of the Act provides that "no carrier, its officers or agents shall change the rates of pay, rules, or working conditions of its employees, as a class *as embodied in agreements* except in the manner prescribed in such agreements or in section 6 of this Act." Section 6, as we have seen, prohibits such changes unless notice is first given and its requirements are otherwise complied with. Section 2, Tenth, of the Act makes it a

misdemeanor, punishable by both fine and imprisonment, for a carrier wilfully to violate § 6.

These sections make it clear that the only conduct which would violate § 6 is a change of those working conditions which are "embodied" in agreements. But the answers here specifically denied that the O. R. C. agreements provided that road conductors operate the five trains in question. This put in issue the meaning of the contracts that allegedly embodied the working conditions which the trustees were about to change. The court, therefore, had to interpret these contracts before it could find that § 6 had been violated.

In interpreting the contracts the court might act in two distinct capacities. First, it might do so in the capacity of a "judicial" "body" in the "possession of the business," or a "carrier" within the meaning of § 1 of the Railway Labor Act. As such it would have to interpret the contracts in order to exercise the jurisdiction conferred by the Bankruptcy Act[2] to control its trustees so as to insure the preservation and proper administration of the debtor's estate. But such instructions, while binding on the trustees and, just as any other order, subject to appellate review, amount to no more than the decision any other carrier would sooner or later make about the course it must follow and, therefore, can not finally settle the dispute between union and employer.

Finally, to settle that dispute the reorganization court would have to act in the further capacity of a tribunal empowered to grant the equitable relief sought, even though granting that relief requires interpretation of these contracts. But Congress has specifically provided for a tribunal to interpret contracts such as these in order finally to settle a labor dispute. Section 3 First (i) of the Rail-

---

[2] See especially Subdivision (c) of § 77 of the Act, which provides that action of trustees in administering an estate shall be "subject to the control of the judge."

way Labor Act provides that disputes between a carrier and its employees "growing out of . . . the interpretation or application of agreements concerning rates of pay, rules, or working conditions . . . may be referred . . . by either party to the . . . Adjustment Board." The Board can not only order reinstatement of the employees, should they actually be discharged, but it can also under § 3, First (o) and (p) grant a money award subject to judicial review with an allowance for attorney's fees should the award be sustained. Not only has Congress thus designated an agency peculiarly competent to handle the basic question here involved, but as we have indicated in several recent cases in which we had occasion to discuss the history and purpose of the Railway Labor Act, it also intended to leave a minimum responsibility to the courts.[3]

Of course, where the statute is so obviously violated that "a sacrifice or obliteration of a right which Congress . . . created"[4] to protect the interest of individuals or the public is clearly shown, a court of equity could, in a proper case, intervene. *Texas & N. O. R. Co.* v. *Brotherhood of Clerks,* 281 U. S. 548; *Virginian R. Co.* v. *System Federation,* 300 U. S. 515. But here it does not clearly appear whether the statute has been violated or complied with or that the threatened action "would be prejudicial to the public interest." *Pennsylvania* v. *Williams,* 294 U. S. 176, 185. We have seen that in order to reach a final decision on that question the court first had to interpret the terms of O. R. C.'s collective bargaining agreements. The record shows, however, that interpretation of these contracts involves more than the mere construction of a "document" in terms of the ordinary meaning of words

---

[3] *General Committee* v. *M.-K.-T. R. Co.,* 320 U. S. 323; *Switchmen's Union* v. *Board,* 320 U. S. 297; *Trainmen* v. *Toledo, P. & W. R. Co.,* 321 U. S. 50; *Telegraphers* v. *Railway Express Agency,* 321 U. S. 342.

[4] *Switchmen's Union* v. *Board, supra,* 300.

and their position. See *Brown Lumber Co.* v. *L. & N. R. Co.*, 299 U. S. 393, 396. *Great Northern R. Co.* v. *Merchants Elevator Co.*, 259 U. S. 285, 291. For O. R. C.'s agreements with the railroad must be read in the light of others between the railroad and B. R. T. And since all parties seek to support their particular interpretation of these agreements by evidence as to usage, practice and custom, that too must be taken into account and properly understood. The factual question is intricate and technical. An agency especially competent and specifically designated to deal with it has been created by Congress. Under these circumstances the court should exercise equitable discretion to give that agency the first opportunity to pass on the issue. Certainly the extraordinary relief of an injunction should be withheld, at least, until then. See *Thompson* v. *Magnolia Petroleum Co.*, 309 U. S. 478, 483–484; *Burford* v. *Sun Oil Co.*, 319 U. S. 315. Only after the Adjustment Board acts, but not until then, can it plainly appear that such relief is necessary to insure compliance with the statute. Until such time, O. R. C. can not show irreparable loss and inadequacy of the legal remedy. The court of equity should, therefore, in the exercise of its discretion stay its hand. *Lawrence* v. *St. Louis-San Francisco R. Co.*, 274 U. S. 588, 592–3 and other cases cited in *Myers* v. *Bethlehem Shipbuilding Corp.*, 303 U. S. 41, 51, n. 9; *Natural Gas Co.* v. *Slattery*, 302 U. S. 300.

We hold that the District Court had supervisory power to instruct its trustees as it did. And a review of the evidence persuades us that the court's findings on which such instructions were based are not clearly erroneous. To the extent that its order constitutes instructions to its trustees, it is affirmed. Of course, in this respect it is no more binding on the Adjustment Board than the action of any other carrier. But the court should not have interpreted the contracts for purposes of finally adjudicating the dispute

between the unions and the railroad. The dismissal of the cause should therefore be stayed by the District Court, so as to give an opportunity for application to the Adjustment Board for an interpretation of the agreements. Any rights clearly revealed by such an interpretation might then, if the situation warrants, be protected in this proceeding.[5]

*It is so ordered.*

MR. JUSTICE JACKSON took no part in the consideration or decision of this case.

MR. JUSTICE RUTLEDGE, dissenting in part.

I agree that the District Court should retain jurisdiction of the cause pending interpretation of the agreements in the procedure provided by the Railway Labor Act for submitting such questions to the Adjustment Board. Section 77 (n) of the Bankruptcy Act was not intended, I think, to give the District Court jurisdiction to determine whether a "change in agreements affecting rates of pay, rules, or working conditions" within the meaning of § 6 has, in fact, taken place. Its sole effect is to require a bankruptcy court to follow the procedure set up by the Railway Labor Act.

In my opinion, however, petitioners are entitled to immediate temporary relief, pending the determination of the Adjustment Board, in order to assure compliance with § 6, if the Board should decide in their favor.

Section 6 enjoins a clear and positive duty on the part of carriers and employees, a duty which is judicially enforceable, since no other remedy is provided.[1] The opinion

---

[5] *Mitchell Coal Co.* v. *Pennsylvania R. Co.*, 230 U. S. 247, 267.

[1] *Texas & N. O. R. Co.* v. *Brotherhood of Clerks*, 281 U. S. 548; *Virginian R. Co.* v. *System Federation*, 300 U. S. 515; *Switchmen's Union* v. *National Mediation Board*, 320 U. S. 297; *General Committee* v. *Missouri-Kansas-Texas R. Co.*, 320 U. S. 323, 331.

See text *infra* as to adequacy of the remedy before the Adjustment Board.

of the Court so rules, as I understand it, for otherwise there would be no reason for holding the cause. But if, pending the Board's determination,[2] the change forbidden by § 6 takes place and the Board's decision turns out to be in favor of the petitioners, the very purpose of § 6 will have been defeated. Its object is to maintain the *status quo,* pending the expiration of the period provided by the section for allowing the processes of negotiation, mediation and conciliation to have play. It is to prevent

---

[2] The situation in this case is unusual because resort must be had to the Adjustment Board before it can be determined whether the forbidden change has been proposed or has taken place in fact.

Whether the relief sought should be granted depends on whether the Adjustment Board finds that the 1943 contract with B. R. T., or action taken thereunder, constitutes a "change in agreements affecting rates of pay, rules, or working conditions" within the meaning of § 6 or one in "the rates of pay, rules, or working conditions of its employees, as a class as embodied in agreements," except as provided in § 6, within the meaning of § 2, Seventh. Cf. also § 77 (n) of the Bankruptcy Act. This in turn will depend upon the effect which the Board finds should be given to the prior agreements, including not only the 1940 contract with O. R. C., but the basic agreements of 1927 and 1928 with O. R. C. and B. R. T., respectively, as affected by the establishment of switching limits in 1929 and other matters bearing upon the interpretation of the written contracts and the rights of the parties.

Only after the Adjustment Board has acted can it be known whether a change in violation of § 6 was proposed or brought about through the 1943 agreement. If petitioners are correct in their view of their rights on the merits, and the Adjustment Board so finds, the 1943 contract and the action taken under it were in violation of § 6. If respondents are right as to the effect of the agreements made prior to 1943, and the Board so finds, no "change" in violation of § 6 was brought about by the 1943 contract, which in that event becomes merely declaratory of preexisting rights. The crucial issue is whether the 1943 agreement "changed," that is, altered the terms of preexisting contractual rights or merely declared them, a question which only the Adjustment Board can decide, initially at any rate, since it requires interpretation of existing collective agreements, not the making of new or different ones. Cf. *Elgin, J. & E. R. Co.* v. *Burley,* 325 U. S. 711.

changes being made until these processes have been exhausted or the prescribed waiting period has expired without bringing them into effect. See *Trainmen* v. *Toledo, P. & W. R. Co.*, 321 U. S. 50; cf. *Elgin, J. & E. R. Co.* v. *Burley*, 325 U. S. 711.

The decision of the Board will not restore this rightful *status quo* for the period required for making its determination, including the time now gone by, or in fact for any later period. The only relief the Board can give is either "an administrative declaratory determination" or an award of money damages, subject to the special provision for judicial review. Although the latter remedy would afford partial vindication of private rights, it does not safeguard the public interest, in accordance with the primary design of § 6.[3] And in many cases it may be impossible for a court to effectuate the Board's decision for the future with adequate restorative measures.[4]

Accordingly I think the District Court should grant temporary relief to O. R. C., as was done at the beginning of this cause,[5] until the rights of the parties have been ascertained and permanent relief is given or denied. Peti-

---

[3] In providing a waiting period before final rupture, with leeway for mediation and conciliation to work, § 6 has the obvious purpose not only to prevent infringement of private rights but more especially to save the public from possible disruption of service. See note 4.

[4] Although only five jobs are involved in this jurisdictional dispute, another may involve 500 or 5000. Ordering the reinstatement of any considerable number of men, once they have been wrongfully thrown out, to displace others who have taken their places itself involves the very kind of disruption, or possibility for it, which Congress sought to ward off by the provisions of § 6. And it is common knowledge that strikes involving large numbers may arise from an employer's adverse action affecting directly only a few employees or even one.

[5] The court granted a stay order upon filing of the petition which remained in effect until April 5, 1943, when the order of reference to the master was made. Thereafter the trustees made effective the 1943 contract with B. R. T. and, in my opinion, by this action violated § 6.

tioners have made a prima facie case,[6] not only for holding the cause pending the outcome of the proceedings before the Adjustment Board but also for temporary injunctive relief pending that decision. Without such relief the public interest will not be adequately protected nor will the court's jurisdiction be preserved, in the sense of power to afford the full relief required by the policy of the Act.

---

[6] The decision of the Court implies that the petitioners' case is not frivolous. That it is not is borne out by the following facts, among others:

The trustees and B. R. T. do not deny that O. R. C. members had performed the work in question continuously for more than thirty-five years or exclusively until the contract of 1943 with B. R. T. was made and put into effect. They allege no protest against this arrangement until shortly after the 1940 agreement with O. R. C.

In 1929 the carrier established switching limit boundaries. Respondents say the effect of establishing these limits was generally that yardmen, represented by B. R. T., should not perform work outside of them and that roadmen, represented by O. R. C., should not perform work within them. The five drills in question lie within the switching limits. O. R. C. contends that the fixing of switching limits was not intended to change the previous practice under which road conductors had customarily manned the five drills. It points to the fact that road conductors continued to work on the five drills after the establishment of switching limits and to the further fact that, by the agreement made in 1940 between O. R. C. and the carrier, the latter agreed not to change the then present method of assigning conductors. O. R. C. also maintains that the basic agreements, taken in conjunction with the 1929 establishment of switching limits, did not prescribe territorial priorities, but merely provided for rates of pay to be applicable within and without the limits established.