**SADLER** et al.

v.

**UNION R. CO.** et al.

Civ. No. 11944.

United States District Court,
W. D. Pennsylvania.

July 17, 1954.

As Amended Sept. 14, and Oct. 4, 1954.

Further Amended Nov. 18, 1954.

See 125 F.Supp. ——.

J. Alfred Wilner, and Morris Zimmerman (of Wilner, Wilner & Kuhn), Pittsburgh, Pa., for plaintiffs.

James R. Orr, and Donald B. Heard (of Reed, Smith, Shaw & McClay), Pittsburgh, Pa., for defendant, Union R. Co.

Albert D. Brandon (of Oliver, Brandon & Shearer), Pittsburgh, Pa., for defendant Brotherhood of Railroad Trainmen, and individual defendants.

MARSH, District Judge.

1. The individual plaintiffs are citizens of Pennsylvania and are and have been nonoperating employees of the Union Railroad, hereinafter called carrier. They sue for themselves and as representatives of a class.

2. Local Lodge 1913, United Steelworkers of America (CIO), hereinafter called USA, was added as a party plaintiff by the court upon petition of the defendants other than the carrier. Lodge 1913 is and has been the bargaining representative under the Railway Labor Act, 45 U.S.C.A. § 151 et seq., of the carrier's employees, who are members of the nonoperating crafts or classes except signalmen, including the crafts or classes in which the individual plaintiffs belong. All of the individual plaintiffs are members of Local Lodge 1913.

3. Defendant carrier is a corporation formed under the laws of the Commonwealth of Pennsylvania and is a common carrier engaged in interstate transportation, having its place of business in East Pittsburgh, Allegheny County, Pennsylvania.

4. The defendant, Brotherhood of Railroad Trainmen, hereinafter called BRT, is an unincorporated labor organization, consisting of a grand lodge and many subordinate lodges, including defendant Lodges 872, 997 and 1018. These subordinate lodges of the BRT are composed of numerous yardmen, viz., conductors, brakemen, switchtenders and car-retarder operators. Since 1943 BRT, through Lodges 872, 997 and 1018, has been the collective bargaining representative under the Railway Labor Act of the operating crafts and classes of conductors, brakemen and switchtenders employed by the carrier. The aforesaid lodges are located within Allegheny County, Pennsylvania, within the jurisdiction of this court.

5. Defendant H. R. Wadsworth is a member of and duly elected president of Lodge 872. Defendant J. E. Berggren is a member of and duly elected president of Lodge 1018. Defendant Herbert Thomas is a member of and the duly elected president of Subordinate Lodge 997. Defendant Q. C. Gabriel is a member of Lodge 872 and general chairman of the general grievance committee of the BRT on the carrier's property. These individual defendants reside within the jurisdiction of this court and except for Q. C. Gabriel are yardmen employed by the carrier.

6. Defendants S. Gregor, G. D. Rhodes and W. J. Cleary are yardmen employed by the defendant carrier and are sued individually and as members of a class. These defendants are all residents within the jurisdiction of this court.

7. The interest of all the members, subordinate lodges mentioned, and the BRT, are adequately represented by the defendants of record. The subordinate lodges are sued as representatives of certain operating employees of the defendant carrier, and all of the subordinate lodges, and of the Brotherhood itself.

8. From April, 1914, to January 7, 1954, the carrier has maintained operations at the coal dock at Duquesne, Pennsylvania. During such time coal and fluorspar have been brought by barge to the coal dock and unloaded from said barges by hoist bucket into a tipple; from the tipple the commodities flowed by chute into freight cars for transportation to mills or to other destinations.

9. From 1914 until January 7, 1954, the carrier's nonoperating personnel, hereinafter sometimes called carloaders, loaded the freight cars at the coal dock. This work included the following duties; after the cars were placed in the empty yard by train crews, the carloaders would prepare the car doors by locking them and packing the doors with excelsior where required, release the brakes and ride the empty cars. It was frequently necessary to use a pinch bar to start the cars moving along the empty track.

When the cars were brought to a stop under the chute, a block was placed in front of the wheels or hand brakes were set, to prevent forward movement of the cars. During the loading operation it would be necessary to move the cars forward somewhat so that the commodity could be properly distributed therein. To accomplish this, the blocks would be pulled from in front of the wheels, or the hand brakes released, and the car permitted to drift forward, or be moved by pinch bar, for a short distance until it was in proper position, when its motion would be stopped by again laying blocks on the rails in front of wheels or by setting the hand brakes. These movements or respots were repeated until the cars were fully loaded, after which an employee rode the car over the scales and onto a track in the loaded yard, setting hand brakes on a sufficient number of cars to prevent their running out the other end of the track. When a track in the loaded yard was full, the coal dock employees would throw a switch to make the next track accessible, and fill that track, setting the requisite number of hand brakes. The loaded cars were then picked up by an engine and train crew, and moved to destinations, after being classified by a train crew.

10. Since May 5, 1938, the carloaders at the coal dock have been members of the nonoperating class or craft of employees represented by the USA as bargaining representative under the Railway Labor Act, and until January 7, 1954, no yardmen or members of BRT had ever performed any of the work at the coal dock. Prior to 1938, the carrier's nonoperating personnel were not represented by any labor organization.

11. Since 1938, USA and the carrier have entered into three collective bargaining agreements, viz.: May, 1938; January 19, 1942; and May 1, 1947. The latter agreement is still in full force and effect.

12. The BRT entered into a collective bargaining agreement with the carrier, effective November 1, 1943, which, with some modifications and supplements, is still in force and effect. The BRT has been exclusive bargaining representative of yardmen employed by the carrier since June 2, 1943. Prior to 1943 and subsequent to 1938 two other unions successively represented the operating personnel.

13. Since 1938 and until January 7, 1954, the nonoperating personnel have acquired seniority in the work at the coal dock under USA agreement with the carrier.

14. During the latter part of 1950, BRT operating employees of the carrier complained of the work done by USA nonoperating personnel at the Duquesne coal dock. Time claims were filed requesting eight hours pay for an extra conductor and two brakemen, because the carloaders were allegedly performing the functions of operating personnel at the coal dock. These time claims were processed in accordance with the collective bargaining agreement between the carrier and the BRT, and consistently denied by the carrier.

15. As an outgrowth of an averted strike, BRT and the carrier entered into a written agreement on July 3, 1953, creating a Special Board of Adjustment for the purpose of disposing of approximately 100 disputes between them, including the time claims of the BRT above mentioned.

16. The agreement of July 3, 1953, provided that there should be established a Special Board of Adjustment consisting of three members. One was to be selected by the carrier, one by the Brotherhood, and the third was to be appointed by the two members so selected by the parties. If the two members selected by the parties could not agree on a third, they were to jointly request the National Mediation Board to appoint a neutral member. The Board was to establish rules of procedure for itself. The Board was to have jurisdiction only of claims and grievances mutually agreed upon by the parties and designated as the "Original list" of cases. An additional list of cases, designated as a "supplemental list," could be mutually agreed upon by

the parties and submitted to the Board, if submitted prior to the Board's final meeting. *The Board was not to have any jurisdiction or authority over disputes involving changes in rates of pay, rules, working conditions, or changing existing agreements.* The Board was to cease to exist upon disposing of all claims and grievances submitted to it under the agreement and, by mutual agreement, the Board could be dissolved prior thereto. Cases could be withdrawn from the Board by mutual agreement of the parties. A majority of the Board was required to render an award, which was to be binding upon both parties to the agreement. A majority of the Board was competent to make such other rulings and decisions necessary to carry out the functions of the Board. Time limits were placed on the various steps provided for in the agreement, though the parties could agree to extend the period for making the awards.

17. None of the plaintiffs or members of the class they represent, or the United Steelworkers of America, were parties to the agreement of July 3, 1953.

18. Representatives of USA did not agree with BRT and the carrier to establish this Special Board of Adjustment.

19. Copies of the Special Board of Adjustment agreement were sent to the National Mediation Board in Washington, D. C. The parties to the agreement named their respective members to the Special Board and, since they were unable to agree on a neutral member, at their request the National Mediation Board preliminarily appointed the neutral member. The National Mediation Board assigned a number (No. 45) to the Special Board of Adjustment and fixed a date when the hearings for the Special Board would sit. The hearings began on August 31, 1953, and were concluded November 20, 1953. The National Mediation Board was kept informed of the action taken by the Board on the matters listed for decision and those items which were added or withdrawn. As the various awards were entered, copies of them were sent by the Chairman of the Special Board to the Mediation Board. The carrier member was paid by the carrier, the BRT member by the BRT, and the neutral member by the National Mediation Board.

20. On September 11, 1953, the Special Board of Adjustment consisting of the carrier member, the BRT member, and the neutral member, held a hearing on the time claims of J. E. Higgins, a member of the BRT, which had been filed with the carrier on November 10, 1950. The Board at said hearing heard testimony of witnesses and received evidence on the merits of the claim from the BRT and the carrier.

21. No notice was given to the individual carloaders who had been performing the work at the coal dock, nor to Lodge 1913, nor to any representative of the USA, of the September 11, 1953, hearing. Neither the carloaders nor their representatives were aware of or participated in that hearing.

22. Subsequent to September 11, 1953, but prior to November 10, 1953, the Special Adjustment Board by a majority vote, the carrier member dissenting, ruled that the carloaders were not entitled to notice of proceedings before the Board and the Board refused to give such notice. The Board, however, at the request of the carrier, agreed that the carrier could invite the president of USA Lodge 1913 to present additional evidence at a reopened hearing before the Board fixed for November 19, 1953.

23. On November 19, 1953, Jacob Mathos, the president of Lodge 1913, appeared at the reopened hearing. At this hearing he testified and presented the view of his organization with respect to the subject matter of the controversy. He did not present a written submission, examine witnesses or otherwise participate. His appearance was in response to the invitation of the carrier by letter, addressed to him as president of USA Local 1913, dated November 10, 1953.

24. None of the individual carloaders who theretofore had worked at the coal dock were given notice by the Board of the hearing of November 19, 1953, nor

does it appear that they had actual knowledge thereof. None of the individual carloaders participated in this hearing.

25. Plaintiffs, either individually or through their union representatives, did not authorize the carrier to represent them at the hearings involving the time claim presented by J. E. Higgins.

26. The USA did not participate in the hearing of November 19, 1953 as a party to the controversy.

27. None of the plaintiffs, nor any of the members of the class they represent, individually and specifically authorized Jacob Mathos, president of the USA Lodge 1913, to represent them at any of the hearings held by the Board involving the time claim of J. E. Higgins.

28. On December 28, 1953, the Board, acting by a majority of its members, made an award sustaining the claim presented by J. E. Higgins, and ordered payment to the BRT members who should have been performing the operating work at the coal dock since November 10, 1950.

29. A copy of the award was delivered by an agent of the defendant carrier to Jacob Mathos, president of Lodge 1913, several days prior to January 7, 1954.

30. By letter dated January 4, 1954, and delivered to USA on January 5, 1954, defendant carrier informed the USA that under the terms of the above award the work heretofore performed by the carloaders at the coal dock is now recognized as the work of the yardmen, who are represented by the BRT.

31. No notice was given to the individual plaintiffs or any members of their class, or to their bargaining representative prior to January 5, 1954, that the carrier would enforce its interpretation of the above award by taking the above work from the carloaders and giving such work to yardmen.

32. No notice was given to plaintiffs, any member of the class they represent, or to plaintiffs' bargaining representative, at any time by the BRT that carloaders at the coal dock would be replaced by yardmen in the performance of the above work.

33. In the award, the Board undertook to construe and interpret the agreement between the carrier and BRT, and, in harmony therewith, determined that the disputed work belonged to the operating employees under the BRT agreement and not to nonoperating personnel despite the long-standing practice and custom.

34. Prior to January 7, 1954, on days when coal dock work was available, four or five members of the class represented by plaintiffs performed the duties of carloaders set forth above.

35. On January 7th and since, because of the award, three BRT members, viz., a conductor and two brakemen, have taken over the operating portion of the duties previously performed by the USA carloaders, namely, releasing brakes on the cars standing empty in the yard, riding them to a position under the chute, setting and releasing the brakes for spotting, and riding the cars over the scales, operating the switches where necessary, and setting the brakes on the loaded cars. As a result of the award two USA carloaders instead of the customary four or five carloaders have been assigned by the carrier to such work.

36. Because of the award, the number of nonoperating USA employees at the coal dock was reduced by approximately one-half, with the consequent loss of wages and the seniority and property rights which were previously enjoyed.

37. The working conditions of the carloaders in a material degree became more onerous and less desirable because of the award since they no longer are entitled to share the easier work of riding and spotting cars previously performed, and which work has now been assigned to the yardmen.

### Discussion.

Upon the authority of Slocum v. Delaware, L. & W. R. Co., 339 U.S. 239, 70 S. Ct. 577, 94 L.Ed. 795, which cites Order of Ry. Conductors of America v. Pitney, 326 U.S. 561, 66 S.Ct. 322, 90 L.Ed. 318, it seems clear that, absent the consent of all parties, the Special Board of Adjustment should have refused to decide the

jurisdictional dispute between the two unions which involves the interpretation of their respective contracts with the carrier, and should have left this question for determination by the Railroad Adjustment Board, pursuant to the requirements of the Railway Labor Act, 48 Stat. § 1185, 45 U.S.C.A. § 151 et seq.

However, since the Board made an award, the effect of which caused the loss of some jobs and changed the working conditions of the plaintiffs, as a class of employees, it also seems clear that a federal court has the power to restrain the enforcement of the said award and restore the *status quo* pending the submission of the dispute to the Railroad Adjustment Board or National Mediation Board under the terms and provisions of the Act.

In Elgin, J. & E. Ry. Co. v. Burley, 325 U.S. 711, at page 728, 65 S.Ct. 1282, at page 1292, 89 L.Ed. 1886, it was held that the Railroad Adjustment Board had jurisdiction under the Act to determine grievances and make awards which were binding upon the parties to the dispute, after notice and hearing. The purpose of the Act was to " * * * add decision where agreement fails * * *."

In reversing an interpretation by a state court of collective bargaining agreements in the Slocum case [339 U.S. 239, 70 S.Ct. 580], the Supreme Court stated: "We hold that the jurisdiction of the Board to adjust grievances and disputes of the type here involved is exclusive."

In Order of Ry. Conductors of America v. Pitney, supra, a federal court's interpretation of a bargaining agreement was reversed for similar reasons.

■ Thus, we conclude an award made by a Special Board, without the consent of one group of employees involved in the dispute—here, the plaintiffs—is legally ineffective and, as to plaintiffs, a usurpation of statutory functions vested exclusively in the Railroad Adjustment Board by Congress, and a District Court has jurisdiction to restrain its enforcement. See Dwellingham v. Thompson, D.C.E.D.

Mo.1950, 91 F.Supp. 787, affirmed *sub. nom.* Rolfes v. Dwellingham, 8 Cir., 1952, 198 F.2d 591.

Both the carrier in its brief and BRT in its request for findings and conclusions, contend that the Special Board is in effect a system, group, or regional board of adjustment, under Section 3, Subdivision Second, of the Act.

■ It is plain, however, that plaintiffs and their bargaining agent did not agree to the establishment of the Special Board. Therefore, it is not a system, group, or regional board. The contract creating it is signed only by the representatives of the carrier and BRT. Mutuality of agreement seems to be a statutory prerequisite to the establishment of a system, group, or regional board, and, where lacking, the award of any such Board is legally ineffective as to employees and their collective .bargaining representative who do not agree or consent. In addition, the procedures set up in the agreement of July 3, 1953, creating the Special Board are at variance with the statutory requirements.

▪ ■ But, assuming that the Special Board was a system, group, or regional board, as defendants contend, and assuming that the plaintiffs had agreed or consented to its establishment, the award nonetheless is invalid because of the failure of the Board *to give notice of all hearings* to the plaintiffs as a class of employees involved in the dispute, as required by Section 3, First (j). In Hunter v. Atchison, T. & S. F. Ry. Co., 7 Cir., 1948, 171 F.2d 594, an injunction was granted against enforcement of the award of the statutory Adjustment Board because the district court found it to be void for lack of notice to one group of employees. See also Hunter v. Atchison, T. & S. F. Ry. Co., 7 Cir., 1951, 188 F.2d 294.

In Allain v. National Railroad Adjustment Board, D.C.Ill.1953, 120 F.Supp. 453, affirmed Allain v. Tummon, 7 Cir., 1954, 212 F.2d 32, an injunction was awarded for the same reason.

■ The Special Board did not give notice to any of the carloaders or their collective representative of the hearings held on September 11 and November 10, 1953. The fact that President Mathos, of Lodge 1913, USA, received actual notice of the reopened hearing held November 10, and was permitted by the Board to attend and give evidence, does not satisfy the requirement of Section 3, First (j) that the employees, as distinguished from their collective representative, be given actual notice of *all* hearings. Elgin, J. & E. Ry. Co. v. Burley, 325 U.S. 711, at pages 734 and 738, 65 S.Ct. 1282, 89 L.Ed. 1886; Allain v. National Railroad Adjustment Board, supra.

None of the litigants contend that the Special Board was a statutory board of arbitration as authorized by Sections 7, 8 and 9 of the Act; nor could it be successfully so contended because the plaintiffs' representative did not sign the agreement to arbitrate and no attempt was made to comply with the other requirements for statutory arbitration.

Plaintiffs assert in their brief that the Special Board was a common law board of arbitration, citing Dwellingham v. Thompson, 91 F.Supp. 787, supra. If plaintiffs' contention is correct, and we think it is, that case and the affirmation thereof in Rolfes v. Dwellingham, supra, indicate that the change in working conditions and loss of some jobs caused by the carrier's action on January 7, 1954, as a result of the award dated December 28, 1953, may be a violation of Section 2, Seventh, and Section 6, of the Act.[1]

But it should not be understood that this court has found that Section 2, Seventh, and Section 6 have been violated by the carrier. To so find would require the court to interpret the two bargaining agreements involved in the light of long continued usage, custom and practice; and that is exactly what is proscribed prior to administrative determination under the Act. See Order of Ry. Conductors of America v. Pitney, supra, 326 U.S. at pages 565 to 567, 66 S.Ct. 322, 90 L.Ed. 318, inclusive.

But if the court cannot invade the exclusive jurisdiction of the administrative boards and interpret the bargaining agreements of the two unions involved prior to administrative determination, neither should the Special Board be permitted to do so without the consent of all parties.

■ BRT argues that plaintiffs suffered no irreparable damages and have an adequate remedy at law. Although the defendants do not cite the Pitney case, supra, it seems to some extent to support the BRT's contention. But in the Pitney case the carrier, acting through its trustee, agreed with the BRT in replacing ORC employees; here, the carrier disagreed with BRT but acted under the compulsion of the award in replacing USA carloaders. In addition, here, the working conditions have become more onerous for the carloaders because of the award, and while a future award of the N.R.A.B. in favor of the USA may allow back wages for the displaced carloaders and reasonable counsel fees, such an award would not compensate the carloaders who remain at the dock for the change in their working conditions whereby two men are now required to do all of the more burdensome physical labor which heretofore was divided among four or five men. We think these distinctions warrant preventative measures, and, as in the Dwellingham cases, an injunction restoring the *status quo* should issue.

1. Section 2, Seventh, of the Act provides that "No carrier, its officers, or agents shall change the rates of pay, rules, or working conditions of its employees, as a class, *as embodied in agreements* except in the manner prescribed in such agreements or in section 6 of this Act." [Emphasis added.] Section 6 prohibits such changes unless at least 30 days written notice thereof is first given and its requirements are otherwise complied with. Section 2, Tenth, makes it a misdemeanor for a carrier willfully to violate Section 2, Seventh.

632

### Conclusions of Law.

■ 1. The court has jurisdiction of the parties and of this proceeding under Section 1337, Title 28 U.S.C.A.

2. Insofar as the plaintiffs are concerned, the award promulgated by the Special Board of Adjustment is void and of no effect.

■ 3. This court is without jurisdiction to make a decision on the merits of a jurisdictional dispute between BRT and USA involving the operation of railroad cars at the carrier's coal dock; the remedies afforded by the Railway Labor Act for the settlement of disputes such as here involved are exclusive.

4. The individual plaintiffs and the members of the class they represent should be restored to the *status quo ante* January 7, 1954, with respect to operating work on railroad cars which they previously performed at the carrier's coal dock, pending determination of the dispute under the provisions of the Railway Labor Act.

5. A Special Board of Adjustment was not a system, group, or regional board within the meaning and intendment of Section 3, subdivision Second, of the Railway Labor Act.

6. The plaintiffs suffered irreparable harm and damage for which they have no adequate remedy at law.

7. Defendants and each of them, and where applicable, their respective officers and agents, should be temporarily restrained from putting into effect the award of the Special Board of Adjustment insofar as it may cause loss of jobs or changes in working conditions of the plaintiffs or members of the class of employees they represent, as same existed prior to January 7, 1954, pending submission, within a reasonable time, of the dispute involved to the administrative boards provided by Congress in the Railway Labor Act.

The plaintiffs are directed to submit a form of decree within fifteen days of this date.