## UNITED RAILROAD OPERATING CRAFTS et al. v. WYER et al.

United States District Court
S. D. New York.
April 16, 1953.

See also D.C., 109 F.Supp. 916.

Maurice R. Whitebook, New York City, for plaintiffs.

Polier & Midonick, New York City, for Brotherhood of Locomotive Engineers and Brotherhood of Locomotive Firemen and Engineers, Clifford D. O'Brien and Ruth Weyand, Chicago, Ill., Harold C. Heiss, Russell B. Day, Cleveland, Ohio, of counsel.

Bernard L. Alderman, New York City, for intervenor.

Richard R. Bongartz, New York City, for William Wyer, as Trustee of the Long Island R. Co., William J. O'Brien, New York City, of counsel.

CONGER, District Judge.

The defendants and the intervenor move to dismiss the amended complaint herein on several grounds.

The plaintiffs move for an injunction pending the trial of the action.

Originally only the defendant Wyer, as Trustee of the Long Island Railroad, was named in the suit. Upon motion of Wyer, the Brotherhood of Locomotive Engineers (referred to hereafter as Engineers) and the Brotherhood of Locomotive Firemen and Enginemen (re-

ferred to hereafter as Firemen) were added as parties defendant. The Brotherhood of Railroad Trainmen (referred to hereafter as Trainmen) was permitted to intervene.

The amended complaint alleges that the plaintiff United Railroad Operating Crafts (referred to hereafter as UROC) is a labor organization, national in scope, organized in accordance with the provisions of the Railway Labor Act, 45 U.S.C.A. § 151 et seq., admitting to membership railroad employees in engine, train, yard and hostling services and crafts; that the plaintiffs Gallagher, Hunt, Carlson and Owens are members of UROC's Local 118 in New York City; that defendant Wyer, as Trustee in bankruptcy, conducts the business of the Long Island Railroad, an interstate carrier subject to the provisions of the Railway Labor Act.

The amended complaint further alleges that prior to June 20, 1952 Wyer entered into separate agreements with the Brotherhoods, railway labor organizations, relating to and controlling hours, wages and working conditions of Wyer's employees, including the plaintiffs; and that said agreements were, on June 20, 1952, supplemented by separate union shop agreements pursuant to the authority of Section 2, Eleventh of the Railway Labor Act; and that the various agreements constitute the respective collective bargaining agreements between Wyer and his employees in engine, train, yard and hostling services, regardless of such employees' membership in any of the contracting Brotherhoods.

It is further alleged that the individual plaintiffs and those of the class on whose behalf they sue have worked for long periods of time for the Long Island as firemen, enginemen, conductors, trainmen, yardmen, hostlers, etc. and have accumulated and enjoy seniority rights in their employment and rights and benefits under the Railroad Retirement Act.

It is further alleged that on or about September 17, 1952, Wyer, pursuant to the union shop agreement with the Firemen, notified plaintiff Gallagher that said Brotherhood had complained that he was not in compliance with said agreement in that he was not a member of a labor organization, national in scope, and that a hearing could be requested in accordance with said agreement; that Gallagher demanded a hearing, which was accorded, and at such hearing, he made proof of compliance with said union shop agreement in that he was a member of UROC; that despite such proof, Gallagher was discharged from Wyer's service on October 16, 1952 by notification in writing stating that he was not in compliance with the union shop agreement.

The amended complaint further alleges facts showing that plaintiffs Hunt, Carlson and Owens are similarly aggrieved in that Hunt was complained of by the Engineers, given a hearing at which he proved membership in UROC, but has not as yet been notified of Wyer's decision [1]; while Carlson and Owens were complained of by the Trainmen; they notified Wyer of their membership in UROC and requested a hearing, but they received no hearing and were nevertheless discharged for failure to avail themselves of the opportunity of being heard.

The amended complaint further alleges, as a consequence of all the foregoing, that the individual plaintiffs, except Hunt, have been deprived of their livelihoods and of their right to continued employment by Wyer, have lost their seniority rights and their benefits under the Railroad Retirement Act solely because of membership in UROC and nonmembership in the respective Brotherhoods; as to Hunt all this deprivation and loss is threatened; that the individual plaintiffs, in joining UROC, exercised their rights pursuant to the provisions of the Railway Labor Act freely to join a labor organization of their own choosing and to transfer from one to another; that Wyer's action in discharging them, or threatening to, as aforesaid, violates the provisions of the Railway Labor Act; that Gallagher and Hunt

1. It is alleged that Hunt is "threatened with unlawful discharge."

were deprived of their earnings on the days of their hearings contrary to law.

It is further alleged that all of the foregoing similarly threatens other UROC members, the effect of all of which will be to cause them and the individual plaintiffs irreparable harm and to destroy UROC contrary to the Constitution of the United States, the Railway Labor Act, the Labor Management Relations Act, 29 U.S.C.A. § 141 et seq., for which there is no adequate remedy at law; that damage to each individual plaintiff will exceed $85,000.

The relief sought by the amended complaint includes generally a permanent injunction against discharge of UROC members for such reason alone, a permanent mandatory injunction reinstating Gallagher, Carlson and Owens and damages.

It should be stated at this time that Gallagher, Carlson and Owens have been reinstated to their positions, and Hunt's threatened discharge has been prevented, by temporary injunction orders issued by Judges of this Court.

Wyer and the Brotherhoods attack the amended complaint on two grounds: (1) that UROC and the individual plaintiffs have an adequate remedy before the National Railroad Adjustment Board under Section 3, First (i)–(p) et seq. of the Railway Labor Act and consequently, that this Court has no jurisdiction over the subject matter of the suit; (2) that UROC is not, as a matter of law, "national in scope" since it has never been certified in a proceeding under Section 3, First (f) of the Railway Labor Act and consequently, that the amended complaint fails to state a claim upon which relief may be granted.

Each of the union shop agreements, which are annexed to the amended complaint, provides in substance that as a condition of continued employment, employees covered by the basic labor agreement, shall, within 60 days after the ef- fective date of the agreement, become and remain members of the contracting union; except that such requirements shall be satisfied if such employees "acquire membership in any one of the labor organizations", other than the contracting union, "national in scope, organized in accordance with the Railway Labor Act and admitting to membership employes [sic] of a craft or class in engine, train, yard or hostling service."

Each of the union shop agreements is in accordance with the provisions of Section 2, Eleventh of the Railway Labor Act[2], as amended in 1951 to authorize union shop agreements.

Section 2, Sixth of the Act[3] provides for settlement by conference of carrier and employee representatives of a "dispute between a carrier or carriers and its or their employees, arising out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions".

Section 3, First (i)–(p) of the Act[4] provides for procedure in the event the dispute is not resolved by conference pursuant to Section 2, Sixth. Section 3, First (i) reads as follows:

"The disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions, including cases pending and unadjusted on June 21, 1934, shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes."

2. 45 U.S.C.A. § 152, Eleventh.
3. 45 U.S.C.A. § 152, Sixth.
4. 45 U.S.C.A. § 153, First (i)–(p).

Following this subdivision are provisions relating to appearances, notice by the Board, hearings, deadlocks, form of award, majority vote, finality of the award, orders, including payment of money, non-compliance and the like. Section 3, First (j)–(p).

Wyer and the Brotherhoods say, in view of the foregoing, that the Adjustment Board has jurisdiction and this Court has not.

In Order of Railway Conductors v. Pitney, 326 U.S. 561, 66 S.Ct. 322, 90 L.Ed. 318, the Supreme Court had before it a dispute between two unions arising out of their claims that their respective bargaining agreements with the defendant entitled them to furnish conductors for certain trains operated by defendant. The District Court had determined that the "yard conductors" were entitled to man the trains in dispute. The Supreme Court held that this was error since Congress has specifically provided for the Railway Adjustment Board to settle such disputes. "Not only has Congress thus designated an agency peculiarly competent to handle the basic question here involved, but as we have indicated in several recent cases in which we had occasion to discuss the history and purpose of the Railway Labor Act, it also intended to leave a minimum responsibility to the courts." (Citing cases) 326 U.S. at page 566, 66 S.Ct. at page 324. Therefore, the District Court should have stayed dismissal of the cause in order to give the Adjustment Board "the first opportunity to pass on the issue." 326 U.S. at page 567, 66 S.Ct. at page 325.

Later, in two similar cases, Slocum v. Delaware, L. & W. R. Co., 339 U.S. 239, 70 S.Ct. 577, 94 L.Ed. 795, and Order of Railway Conductors of America v. Southern Ry. Co., 339 U.S. 255, 70 S.Ct. 585, 94 L.Ed. 811, the Supreme Court held that the jurisdiction of the Adjustment Board to adjust the disputes there involved was *exclusive* and that the State courts erred in assuming jurisdiction.

The plaintiffs argue, however, that these cases are not controlling because the matters of which they complain are not within the jurisdiction of the Adjustment Board; that the Board has jurisdiction solely of "disputes * * * growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules or working conditions"; and that their dispute is not covered by such jurisdiction.

The plaintiffs point out that Section 2, Eleventh permits the parties to agree on the requirement of union membership "as a condition of continued employment" which they say is distinguishable from "working conditions", in that the former prescribes a condition precedent to employment while the latter concerns conditions affecting the performance of the work of employees. Therefore, it is said, the dispute does not arise out of grievances or out of the interpretation or application of agreements concerning "working conditions"; hence the Adjustment Board has no jurisdiction since, obviously, "rates of pay" or "rules" is not involved.

"Working conditions" has been defined as "such conditions affecting the work of the employees as might be the subject of agreement between the carriers and the employees." Missouri Pacific R. Co. v. Norwood, D.C.W.D.Ark.1930, 42 F.2d 765, 773, certiorari denied 283 U.S. 249, 51 S.Ct. 458, 75 L.Ed. 1010; In re Chicago North Shore & M. R. Co., 7 Cir., 1945, 147 F.2d 723, 727, certiorari denied Brotherhood of Locomotive Firemen and Enginemen v. Chicago, N. S. & M. R. Co., 325 U.S. 852, 65 S.Ct. 1089, 89 L.Ed. 1973. Is not union security an appropriate subject of agreement?

In Section 9(a) of the National Labor Relations Act [5], the phrase "rates of pay, wages, hours of employment, or other conditions of employment" approximates "rates of pay, rules, or working conditions" found in the Railway Labor Act. And "conditions of employment" expressed in the National Labor Relations

5.   29 U.S.C.A. § 159(a).

Act has been held to include union security and, therefore, to be the subject of agreement. See e. g. National Licorice Co. v. N. L. R. B., 309 U.S. 350, 60 S.Ct. 569, 84 L.Ed. 799; N. L. R. B. v. Andrew Jergens Co., 9 Cir., 1949, 175 F.2d 130, certiorari denied 338 U.S. 827, 70 S.Ct. 76, 94 L.Ed. 503. Further, Section 2, Eleventh of the Railway Labor Act, authorizing union shop agreements, is "substantially the same" as the 1947 union shop amendments to the National Labor Relations Act. S.Rep. No. 2262, 81st Cong., 2d Sess., p. 3, U.S.Code Cong. Serv., 81st Cong. Second Sess., 1950, Vol. 2, pp. 4319, 4321.

In 1951, the Special Emergency Board set up by the President to consider a controversy between carriers and unions reported to the President on this very problem as follows:

"The general purposes of the act are objectives which apply to emergency boards as well as to all other administrators of the act. These include avoiding any interruption to commerce and providing for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions. It has been suggested that the disputes contemplated would not encompass those over union security. The answer suggests itself in the first purpose of the act, namely, to avoid interruptions to commerce. If further technical justification is desired, it may be found in two facts evident on the face of the act. A dispute concerning *rules* is a dispute over the provisions to be included or already included in the agreement, other than the wage schedule, the word 'rules' having this broad meaning in labor relations in the railroad industry. * * *.

"There can no longer be any serious question as to whether a dispute over union security is a proper subject of collective bargaining. There are now collective bargaining agreements affecting millions of American wage-earners which provide for compulsory union membership. One would have to be most naive to believe that such provisions were not the results of demands by the unions and of collective bargaining on the subject thereafter.

"In Order of Railroad Telegraphers v. Railway Express Agency, where the Supreme Court had occasion to consider the scope of collective bargaining contemplated under the 1926 Railway Labor Act, it stated:

" 'Collective bargaining is not defined by the statute which provided for it, but it generally has been considered to absorb and give statutory approval to the philosophy of bargaining as worked out in the labor movement in the United States. 321 U.S. 342, 346, 64 S.Ct. 582, 88 L.Ed. 788.'

"Additional support for the proposition that union security is a proper subject of collective bargaining may be found in the National Licorice Company v. N. L. R. B., 309 U.S. 350, 360, [60 S.Ct. 569, 84 L. Ed. 799] and in N. L. R. B. v. [Andrew] Jergens Co., 175 F.2d 130, certiorari denied 338 U.S. 827 [70 S.Ct. 76, 94 L.Ed. 503]. Ninth Circuit, 1949. When the 1951 union-shop amendment to the Railway Labor Act was under consideration by Congress, not only were all the arguments of principle and policy thoroughly reviewed in the committee hearings or on the floor of both Houses, but there were many general discussions concerning the act as a whole. Congress was fully aware of the provisions of the Railway Labor Act as to the purposes and functions of emergency boards under the act. In electing to make union-shop agreements permissive thereafter, nothing can be found in the statute or in the legislative history of the amendment which even remotely suggests that the Congress intended to set disputes between carriers and labor organizations

over union shops apart from all other kinds of disputes. If the Congress meant to exclude disputes over the union shop from the procedures of the act for the treatment of disputes, including the emergency board provisions, it is not unreasonable to believe it would have said so in the statute." Report to President by the Emergency Board appointed by Executive Order 10306 [U.S.Code Cong. and Adm.Service 1951, p. 1141], N.M.B. Case No. A3744, pp. 12-13.

I am convinced that the present controversy arises out of the interpretation or application of agreements concerning "working conditions" as used in Section 3, First (i) of the Railway Labor Act.

Next, the plaintiffs direct attention to the case of Steele v. Louisville N. R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 and similar cases which they contend apply to their situation.

The Steele case concerned a collective bargaining agreement between a union and a carrier, the purpose of which was to discriminate against Negro firemen in the carrier's employ. Although the Negro firemen were not permitted to join the union, the latter was nevertheless their collective bargaining representative. The Court held that the collective bargaining representative was bound to represent all employees in the craft without discrimination because of race; that the collective bargaining agreement was invalid and that, therefore, the Court and not the Adjustment Board had jurisdiction since the latter has power to deal only with the interpretation and application of agreements.

Since there is not one line in the amended complaint suggesting that the collective bargaining agreements here are invalid [6], I am at loss to discover how the Steele case applies in that respect.

There is, however, language in the Steele case, whether dicta or not, which causes me concern and which parallels the situation here.

"Whether or not judicial power might be exerted to require the Adjustment Board to consider individual grievances, as to which we express no opinion, we cannot say that there is an administrative remedy available to petitioner or that resort to such proceedings in order to secure a possible administrative remedy, which is withheld or denied, is prerequisite to relief in equity. Further, since § 3, First (c) permits the national labor organizations chosen by the majority of the crafts to 'prescribe the rules under which the labor members of the Adjustment Board shall be selected' and to 'select such members and designate the division on which each member shall serve', the Negro firemen would be required to appear before a group which is in large part chosen by the respondents against whom their real complaint is made. In addition § 3, Second, provides that a carrier and a class or craft of employees, 'all acting through their representatives, selected in accordance with the provisions of this Act', may agree to the establishment of a regional board of adjustment for the purpose of adjusting disputes of the type which may be brought before the Adjustment Board. In this way the carrier and the representative against whom the Negro firemen have complained have power to supersede entirely the Adjustment Board's procedure and to create a tribunal of their own selection to interpret and apply the agreements now complained of to which they are the only parties. We cannot say

6. The plaintiffs snipe at the agreements in their memoranda in connection with the carrier's power to determine compliance and power to summarily discharge; but they present no authority to sustain the charge. Paragraph 14 of the amended complaint alleges the "sole question involved * * * is whether or not the members of Plaintiff UROC * * * are entitled to employment with the Defendant * * * while maintaining their membership solely in * * * UROC."

that a hearing, if available, before either of these tribunals would constitute an adequate administrative remedy." 323 U.S. at pages 205–206, 65 S.Ct. at page 233.

UROC has no representatives on the Adjustment Board. The only way it can place its representatives on the Board is by seeking to participate under Section 3, subd. First (c) of the Act[7] and in the event a dispute arises over its right to be represented, it may petition the Secretary of Labor who invokes the procedure specified in Section 3, subd. First (f) [8]. For my part, I think UROC should seek representation but for reasons best known to it, it evidently does not. However, the fact remains that the plaintiffs face a hard task if they are sent to the Adjustment Board for they will be confronted by the Brotherhoods who in effect have already determined their case by complaint to Wyer. In view of the fact that I believe the Adjustment Board has jurisdiction, which the Supreme Court has said is exclusive, I am not certain whether there is room for concern over how plaintiffs will fare before the Board. And it is a fantastic thought that every employee who is discharged under a union shop agreement can run to Court about it.

This same problem has arisen in two other Courts of late. In UROC v. Northern Pacific R. Co. (W.D.Wash., S.Div.) Judge Lindberg, by order in open court dated July 11, 1952, denied a motion to dismiss UROC's complaint on condition that plaintiffs prosecute within 30 days their claims before the Adjustment Board. And he stayed proceedings pending "exhaustion by plaintiffs of the procedure and remedies under said Act."

In Lake & UROC v. B. & O. R. Co. (S.D.Ohio, W.Div.) Judge Druffel dismissed in open court on February 20, 1953, the plaintiffs' action on the ground that "this Court considers that this is primarily a matter for the Railroad Adjustment Board."

The Adjustment Board has docketed a proceeding involving a similar dispute in the case of Brotherhood of Locomotive Firemen & Enginemen v. Chicago, B. & Q. R. Co. (1st Div. National Adjustment Board, Docket 3074). Plaintiffs claim jurisdiction of the Board is, or will be, attacked.

A Special Board of Adjustment in the case of H. J. Stelmack has decided a similar problem. (Special Board of Adjustment No. 17, decision dated July 8, 1952 at Baltimore.) It is speculative whether it may be said that the Board has "exercised jurisdiction" in the Stelmack matter since the Special Adjustment Board was set up pursuant to the union shop agreement between the parties which is authorized by Section 3, Second of the Act.[9] That Section states in part that "In the event that either party * * * is dissatisfied with such arrangement, it may * * * elect to come *under the jurisdiction of the Adjustment Board.*" (Emphasis added.)

Paragraph 1 of the amended complaint alleges that Labor Management Relations Act of 1947 as a basis for jurisdiction. That Act is expressly made inapplicable to matters covered by the Railway Labor Act. 29 U.S.C.A. § 142 (3), § 152(2), (3).

Under all the circumstances, I am satisfied that the Adjustment Board has jurisdiction over the matters alleged in the amended complaint including the dispute with respect to whether two of the plaintiffs were given hearings or not; that since the Board has jurisdiction it is exclusive within the rule of the Pitney [10], Slocum and Southern R. Co. cases, supra.

---

7. 45 U.S.C.A. § 153(c).

8. 45 U.S.C.A. § 153(f).

9. 45 U.S.C.A. § 153, Second.

10. The Court did not dismiss the Pitney suit but directed the District Court to stay it pending application by the trustees to the Adjustment Board. It may be that the distinction between the Pitney case and the Slocum and Southern R. Co. cases depends only on the reorganization court's supervisory power over the trustees. The petition would remain pending until the trustees reported back.

I, therefore, grant the motion of Wyer and the Brotherhoods to dismiss the amended complaint on this ground. I do not pass on the question of whether or not UROC is national in scope.

It is alleged in the amended complaint that each plaintiff will be damaged in excess of $85,000. This, however, does not purport to change the suit into one for damages for wrongful discharge. If it does, the general jurisdictional requirements would apply. Since there would be no Federal question involved in that case, diversity of citizenship would be necessary. The amended complaint shows there is no diversity.

I deny the plaintiff's motion for an injunction pending trial.

The temporary stay shall remain in effect until the order upon this decision is filed. Such order shall be settled on notice.