THE STATE OF MISSOURI, at the Relation of ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, a Corporation, Relator, v. HONORABLE HARRY F. RUSSELL, Judge of the Circuit Court of the City of St. Louis, Missouri, Respondent.—No. 41176.—219 S. W. (2d) 340.

Court en Banc, March 14, 1949.

Rehearing Denied, April 11, 1949.

*M. G. Roberts, E. G. Nahler, C. H. Skinker, Jr.,* and *A. J. Baumann* for relator.

*Victor Packman* and *Henry D. Espy* for respondent; *Charles. H. Houston* of counsel.

1138

*Dubail & Judge* for C. O. Carnahan, General Chairman, Brotherhood of Railroad Trainmen, *amicus curiae.*

1142

[341] HYDE, J.—Relator seeks to prohibit respondent Judge from proceeding in a case brought by two of its train porters asking declaratory and injunctive relief on behalf of themselves and others similarly situated. The question for decision is whether the courts of this state have jurisdiction to act in a controversy between train porters and brakemen (members of the Brotherhood of Railroad Trainmen) as to which are entitled to jobs designated ''passenger brakemen-baggagemen;'' it being claimed that the purpose of the dispute is to deprive the train porters of job functions because of their race and color.

The petition in the circuit court alleged that plaintiffs were, and for many years had been, performing all the necessary tasks of head-end passenger brakemen but, because they were negroes, were called train porters, given certain additional duties and received less pay than white brakemen; that they were not permitted to become members of organizations of white brakemen and other white trainmen; and that these organizations refused to represent them in collective bargaining. It was further stated that from 1918 to 1921, under [342] the United States Railroad Administration, train porters were classified and received pay as brakemen but after its release of control they were reclassified as train porters; and that in 1928 an agreement was made between relator and four brotherhoods representing white employees, preventing their promotion or job reclassification and providing that ''in the future hiring of employees in train, engine and yard service but not including train porters, only white men shall be employed.'' It was also stated that train porters had handled baggage on baggage cars but that after January 1946 this work was arbitrarily assigned to white men on Relator's Trains 1 and 2; and that in May 1948 Relator posted notices ''that vacancies existed on Trains 9 and 10 for 'passenger brakemen-baggagemen,' and also 'chair car porters'; that bids would be accepted for the above positions to and including 4 p. m., May 14, 1948; and that the qualifications for 'brakemen-baggagemen on Nos. 9 and 10 are the same as the quali-

fications for baggage-brakemen on Nos. 1 and 2' (who are white men)." It was further stated that Relator "advised them and others that their job functions as head-end brakemen would be taken over by white men, members of the Brotherhood of Railroad Trainmen, who under schedules are classified as baggage-brakemen, and that chair car porters would take over their remaining functions." Plaintiffs stated that an arrangement had been made "with the white Brotherhood of Railroad Trainmen to turn over the head-end brakemen jobs to white men on other runs as well;" and that this would relegate them and other train porters to menial work.

The relief sought included a declaration "that the realities and not the fictions of job titles should control with reference to rates of pay and seniority classification and other working conditions; and that they are none the less brakemen even though Negroes and designated as 'train porters'."

A temporary injunction was ordered by the circuit court, in accordance with the prayer of the petition, "enjoining the Defendant, its officers and agents, from displacing plaintiffs and other similarly situated from their job functions as head-end brakemen with white brakemen, or from taking away from them on any trains their present job functions as brakemen, or from taking job functions or employment opportunities away from plaintiffs and others similarly situated and reassigning the same functions to white persons under a discriminatory racial employment policy, or from giving said functions job nomenclatures that arbitrarily exclude negroes, because negroes are not employed under the nomenclatures adopted, or from entertaining any bids for baggagemen-brakemen, based on the posted notices referred to in evidence with refrence to trains No. 9 and No. 10, or from refusing to hire or use qualified negroes to fill job vacancies as baggagemen or so-called baggagemen-brakemen, irrespective of organization affiliation, or absence thereof of such persons."

Relator alleges "that the controversy presented is a jurisdictional labor dispute involving the claims of two groups of employees on Relator's railroad, each having contracts with Relator negotiated by its respective bargaining representatives, and each claiming the right to do certain items of work and fill certain jobs; and that under the applicable and controlling Acts of Congress, and particularly the Railway Labor Act, 45 U.S.C.A., Sec. 151, et seq., the jurisdiction to hear and determine said dispute is vested in certain Boards thereby established." Relator also alleges that two other suits, involving this same jurisdictional dispute, were pending in the United States District Court in St. Louis. One of these, Howard v. Thompson, appears in 72 Fed. Supp. 695.

In respondent's return, the situation in the Howard case is stated and it is alleged that "on March 7, 1946, under strike threat and pressure from the Brotherhood of Railroad Trainmen, Relator attempted

to abolish the position of 'train porter' effective April 1, 1946, and replace petitioners with white workers classified as 'brakemen,' not because of any complaint about petitioners' work, but solely because of their color." It is also alleged in the return that "under the Railway Labor Act the First Division of the National Adjustment Board has jurisdiction over certain disputes between carriers and their trainmen. The [343] First Division consists of ten members; five carrier members and five labor members coming from unions National in scope. Each member of the First Division receives his compensation for services on the Board from the party he represents, and his compensation at all times remains wholly subject to the control of said party (45 U. S. C., Sec. 153)"; and that "the five labor members on the First Division come one each from the Brotherhood of Railroad Trainmen, the Switchmen's Union of North America, the Order of Railway Conductors, the Brotherhood of Locomotive Engineers, and the Brotherhood of Locomotive Firemen & Enginemen; and receive their compensation for services on the First Division from their respective organizations. All five organizations bar Negroes from membership solely because of race." For these reasons, it is claimed that plaintiffs, and other train porters had no adequate administrative or legal remedy. Relator's reply states that, from the admitted facts in the pleadings, it appears as a matter of law that a jurisdictional labor dispute is involved, which is beyond the jurisdiction of the respondent Judge.

C. O. Carnahan, General Chairman, Brotherhood of Railroad Trainmen, filed a motion to intervene which has been submitted to the trial court for ruling. In his brief filed herein, as amicus curiae, it is stated: "The object of the suit below, as shown by paragraph 12 and the prayer of the petition, is to effect a reclassification of the craft of train porters to brakemen, amending the brakemen's seniority rosters to give effect to this reclassification, and to require the retention and employment of train porters as head-end brakemen and baggage-brakemen."

Plaintiffs rely mainly on Steele v. Louisville & Nashville R. Co., 323 U. S. 192, 65 S. Ct. 226, 89 L. Ed. 173 [See also Tunstall v. Brotherhood of Locomotive F. & E., 323 U. S. 210, 65 S. Ct. 235, 89 L. Ed. 187.] It was held therein that a state court had jurisdiction to protect by injunction the minority of a craft or class of railroad employees from discrimination because of their race by the exclusive bargaining representative of the craft or class. In that case the union, which was the exclusive bargaining agent for all firemen, was acting adversely on racial grounds to some of the firemen they were supposed to represent. The court held the Railway Labor Act "expresses the aim of Congress to impose on the bargaining representative of a craft or class of employees the duty to exercise fairly the power conferred upon it in behalf of all those for whom it acts, without hostile discrim-

ination against them"; that "this does not mean that the statutory representative of a craft is barred from making contracts which may have unfavorable effects on some of the members of the craft represented"; but that the statute "does require the union, in collective bargaining and in making contracts with the carrier, to represent non-union or minority union members of the craft without hostile discrimination, fairly, impartially, and in good faith." It further explained that "the representative is clothed with power not unlike that of a legislature which is subject to constitutional limitations on its power to deny, restrict, destroy or discriminate against the rights of those for whom it legislates and which is also under an affirmative constitutional duty equally to protect those rights."

We do not think the Steele case can apply here because the train porters have their own union and they have never been represented by the Brotherhood of Railroad Trainmen or determined to belong to any craft or class represented by that Brotherhood. Moreover, under the decisions of the United States Supreme Court, no court has authority to decide that the Brotherhood does or must represent them. The Court carefully pointed out in the Steele case: "The question here presented is not one of a jurisdictional dispute, determinable under the administrative scheme set up by the Act, cf. Switchmen's Union v. National Mediation Board, 320 U. S. 297, 64 S. Ct. 95; General Committee v. Missouri-Kansas-Texas R. Co., 320 U. S. 323, 64 S. Ct. 146; General Committee v. Southern Pacific Co., 320 U. S. 338, 64 S. Ct. 142; Brotherhood of Railway & Steamship Clerks v. United Transport Service Employees, 320 U. S. 715, 64 [344]S. Ct. 260; Id., 320 U. S. 816, 64 S. Ct. 433, or restricted by the Act to voluntary settlement by recourse to the traditional implements of mediation, conciliation and arbitration. General Committee v. Missouri-Kansas-Texas R. Co., supra, 320 U. S. 323, 337, 64 S. Ct. 150, 153. There is no question here of who is entitled to represent the craft, or who are members of it, issues which have been relegated for settlement to the Mediation Board, Switchmen's Union v. National Mediation Board, supra; General Committee v. Missouri-Kansas-Texas R. Co., supra. Nor are there differences as to the interpretation of the contract which by the Act are committed to the jurisdiction of the Railroad Adjustment Board." The cases so cited in the Steele opinion are the ones upon which relator and intervenor rely.

In the Switchmen's Union case, it was held that the courts were without power to review certification of the National Mediation Board, made in accordance with 45 U. S. C. A. 152, Ninth, that the Brotherhood of Railroad Trainmen was the organization authorized to represent all yardmen of the New York Central System. The relief sought, of cancellation of the certification and injunction, was denied. In General Committee v. M.-K.-T. R. Company, the Court considered a controversy between the Brotherhood of Locomotive Engineers and

the Brotherhood of Firemen and Enginemen, over calling of engineers for emergency service. The Railroad had entered into a new agreement with the Firemen for handling working lists and cancelled its previous arrangements with the engineers giving them certain preferences. The Engineers brought a declaratory judgment action that the new agreement was in violation of the Railway Labor Act. The Court held that no justiciable issues were presented, and that Congress had by the Act foreclosed resort to the courts of the claims asserted by the parties. It said this was "a jurisdictional dispute—an asserted overlapping of the interests of two crafts"; and that "when Congress came to the question of these jurisdictional disputes, it chose not to leave their solution to the courts" but "selected different machinery for their solution." The Court further said: "In view of the pattern of this legislation and its history the command of the Act should be explicit and the purpose to afford a judicial remedy plain before an obligation enforcible in the courts should be implied. Unless that test is met the assumption must be that Congress fashioned a remedy available only in other tribunals. There may be as a result many areas in this field where neither the administrative nor the judicial function can be utilized. But that is only to be expected where Congress still places such great reliance on the voluntary process of conciliation, mediation and arbitration." In General Committee v. Southern Pac. R. Co., the same conclusion was reached as to a jurisdictional dispute between the Engineers and Firemen. All three of these cases were decided on the same day. [See also Order of Railway Conductors of America v. Pitney, 326 U. S. 561, 66 S. Ct. 322, 90 L. Ed. 318; Missouri-Kansas-Texas R. Co. v. Randolph (C. C. A. 8th) 164 Fed. (2d) 4.]

We think that the question involved in this case is a jurisdictional dispute. The train porters claim that, along with other duties, they have been performing and are entitled to perform the functions of head-end brakemen, just as the overlapping functions of engineers and firemen, and other workmen, resulted in similar claims in the above cited cases. The Brotherhood of Railroad Trainmen claim for themselves the right to perform these particular functions; and the real question was which organization was to get this work for its members. The many cases, involving similar controversies between unions with white membership, show that race and color need not be involved to cause a dispute over such a question. Facts such as these were held to show a jurisdictional dispute, in the case preceding this one in the United States District Court, Howard v. Thompson, 72 Fed. Supp. 695, in which these same groups and the same railroad were involved. That case shows that there has been a dispute for many years over the performance of the functions of brakemen by train porters. In that case, the issues were not only prohibiting train porters from performing any of the functions of brakemen on passenger trains but

[345] also abolishing the position of train porter on relator's railroad and discharging all of the present train porters. It was also claimed therein by the train porters that it was the duty of the Brotherhood to represent them as brakemen and that they were entitled to the benefits of any contracts between the Brotherhood and the Railroad. That claim, if established, would have made the Steele case applicable to the train porter's situation; but the Court found against that claim.

The Court held that the train porters had been designated as a particular class or craft for many years; that they had been represented in negotiations by their own organization; that through their organization, they had negotiated numerous contracts with carriers; and that, if they desired to have the Brotherhood represent them, "they must submit that question to the Mediation Board, which has been given exclusive jurisdiction by Congress to determine all disputed questions with respect to classification and representation." [Citing 45 U. S. C. A. Sec. 152, Ninth.] The Court further held that the jurisdictional dispute must be referred to the National Railroad Adjustment Board. [Citing 45 U. S. C. A. 153, First (i); and General Committee v. M.-K.-T. R. Co., supra.] However, the Court said: "Should the Mediation Board determine upon application that the porters have been improperly classified for purposes of representation, and that they should have been represented by the Brotherhood, or, if the National Railroad Adjustment Board should hold that under the contract with the Brotherhood of Trainmen, Brakemen, Porters, Switchmen, Firemen and Railway Employees, Incorporated, or because of long standing custom the porters, as such, are entitled to perform the functions of brakemen, then clearly the plaintiff and his group will suffer irreparable injury through the loss of their jobs, for which they have no administrative remedy and no adequate remedy at law." The Court also held that taking from the train porters certain functions and bestowing them elsewhere amounted to a change in an agreement affecting working conditions for which the Railway Labor Act required 30 days' notice. [45 U. S. C. A. 152, Seventh, and 156.] Therefore, the Court continued its restraining order "pending determination by the National Railroad Adjustment Board of the question of jurisdiction as to the performance of the functions of brakmen by the porters, and for a determination of the question of the classification and right or duty of representation by the Mediation Board, or for a reasonable time within which the plaintiff through his labor organization representative may invoke the jurisdiction of those Boards."

In this case, the train porters claim that the creation of the jobs of baggagemen-brakemen on trains 9 and 10, the elimination of train porters on these trains, and the creation of the jobs of chair car porters thereon, is part of an attempt to do piecemeal what it was

intended to do all at one time in the Howard case.   They say this should be judged by the same rule as an attempted change in rules and working conditions without complying with the 30 day notice required under the Railway Labor Act.  We think that the petition did state sufficient facts to entitle them to relief on these grounds and that the trial court has jurisdiction to enjoin the discharge of plaintiffs as train porters on the trains involved, and the changing of rules and working conditions to abolish their jobs and replace them with. the other jobs created for that purpose; until the Boards established by the Railway Labor Act have decided the jurisdictional dispute, and the representation and classification matters, or for a reasonable time for their jurisdiction to be invoked.

However, the present restraining order is too broad because it attempts to decide a railroad jurisdictional dispute and a classification question which the United States Supreme Court has ruled courts do not have jurisdiction to decide.  The fact that members of one union are white and members of another are colored cannot prevent such a dispute over the right. to perform certain overlapping job functions from being a jurisdictional dispute.  Neither does that fact entitle them to by-pass the Boards established by Congress for the settlement of such disputes, according to the [346] recent decision of the United States Court of Appeals, Fifth Circuit, in Hampton v. Thompson, 171 Fed. (2d) 535.  Even in the Steele case, the Court did not hold that the collective bargaining agent, which was found to have actually discriminated against negro firemen, was thereby disqualified from representing them; but it only authorized enjoining the making of discriminatory agreements and the enforcement of discriminatory provisions of the agreement made.  In effect, our courts of equity are invoked to decide issues of classification, representation and job disputes on the ground that the members of the National Mediation Board, appointed by the President of the United States, and the members of the National Railroad Adjustment Board, designated as provided by Congress, would be incapable of acting in good faith and without racial discrimination, before they have ever considered the matters involved; and to say that the methods provided by Congress to settle such questions are inadequate and improper.  As said by the United States Supreme Court in General Committee v. M.-K.-T. R. Co. supra, ''Courts should not rush in where Congress has not chosen to tread'' because ''any decision on the merits would involve the granting of judicial remedies which Congress chose not to confer.'' Thus it appears that changes in the present scheme for settlement of such issues is a matter for the Legislative Branch of our Government and not for the Judicial Branch.  We, therefore, hold that these are not justiciable issues for our courts; and that it is an excess of jurisdiction to consider them.

Our rule is made absolute to prohibit respondent judge from making any determination or order concerning the jurisdictional, classification or representation issues herein involved or from declaring plaintiffs' status or rights as to any position or job functions; and, in all other respects, our rule is discharged. The temporary injunction is dissolved except as to enjoining taking away from plaintiffs their present job functions on any trains or replacing them with baggagemen-brakemen, which may be continued pending determination of the jurisdictional, classification and representation questions by the Boards established by the Railway Labor Act or for a reasonable time to invoke the jurisdiction of those Boards. All concur.