**UNITED STATES v. LUEHR et al.**
No. 13562.

United States Court of Appeals,
Ninth Circuit.

Nov. 9, 1953.

Lloyd H. Burke, U. S. Atty., Keith R. Ferguson, Sp. Asst. to the Atty. Gen., J. Stewart Harrison, Atty. Dept. of Justice, San Francisco, Cal., for appellant.

Herbert Resner and Raoul D. Magana, Los Angeles, Cal., for appellee Frank Luehr.

John H. Black & Edward R. Kay, San Francisco, Cal., for appellee Jones Stevedoring Co.

Before HEALY and BONE, Circuit Judges, and JAMES M. CARTER, District Judge.

HEALY, Circuit Judge.

Appellee Luehr, an employee of appellee Jones Stevedoring Company, brought suit against the United States under the Public Vessels' Act, 46 U.S.C.A. § 781 et seq., to recover damages in consequence of a personal injury sustained on board the USNS Shawnee Trail while a deck cargo of jet planes was in process of being loaded on the vessel. The United States, pursuant to Admiralty Rule 56, 28 U.S.C.A., impleaded Jones Stevedoring Company asking recovery from it of amounts for which the government might be found liable to Luehr, inasmuch as the stevedoring contract between the government and Jones provided that the latter shall hold the government harmless from liability for bodily injury to or death of persons occasioned either in whole or in part by the negligence or fault of Jones, its agents or employees, in the performance of work under the contract. The appeal is from a final decree against the United States in favor of Luehr and from a decree dismissing Jones from liability.

At the time of Luehr's injury the stevedoring work on board the Shawnee Trail was being performed by Jones. In the process of the loading operations the plane fuselages, minus engine and wheels, were lifted from an Army barge to what is called the mechano deck of the Shawnee Trail by use of a large floating crane or heavy lift barge tied between the Shawnee Trail and the Army barge. All three of these vessels were owned and operated exclusively by the government. The operation of moving the plane from the Army barge by use of the derrick or crane of the heavy lift barge was directed by the whistleman, an employee of the government, who was in charge of the heavy lift barge. The crane operator, also a government employee, operated the controls of the crane and took orders only from his foreman, the whistleman above mentioned.

At the time of the accident a plane had been lifted from the Army barge and carried over the mechano deck of the Shawnee Trail to a position approximately over the place at which it was to be stowed and secured on the mechano deck, and had been lowered by the crane to a position a few feet above the mechano desk. Luehr had taken hold of the left rear strutstand, or landing gear, of the plane with the idea of steadying and guiding it into its position on the platform where it was to be fastened down. The crane operator aboard the derrick barge at that moment inadvertently caught his sleeve on a lever control, releasing the friction gear and causing the plane to drop suddenly and grieviously injure Luehr.

Concededly the United States was at fault in the matter since the sudden and unexpected dropping of the plane was the consequence of negligence on the part of its employee, the crane operator. The contention of the government is that negligence of the stevedoring company was also involved in that its employee Luehr, so it is said, unnecessarily placed himself in a position of danger under a suspended load and was not warned to remove himself therefrom by the stevedore foreman. Thus the argument runs, the stevedoring company is liable over to the United States for the full amount of the judgment under the terms of the contract whereby Jones assumed liability

for personal injury occasioned in whole or in part by its own negligence. Appellees, on the other hand, say that at the moment of the accident Luehr was in a position in respect of the suspended plane where his job required him to be and that he was doing what was necessitated by his duties. The trial court in its evaluation of the testimony reached a like conclusion.

A word or two more with respect to the background facts may be helpful. A mechano deck is a type of superstructure built of adjustable steel I-beams at a distance above the main deck of the vessel. The beams form a structure resembling the steel skeleton of a building during construction. The planes are placed one at a time upon this deck in a pattern previously furnished by a representative of the Army, the bodies being fastened securely by attaching the landing gear of the plane to small wooden platforms which are bolted to the I-beams. While a plane is being lifted and swung over the mechano deck it is steadied and prevented from swinging by stevedores who hold onto long ropes or lines attached to various portions of the plane. When the plane has been lowered down approximately to the place where it is to be stowed and is within reach of the men, the lines are discarded as no longer of use and the men take hold of the plane with their hands to guide and control it until it is actually landed in the exact position on the platform.

■■ According to counsel for the government, "the testimony and the physical facts" prove that this final spotting of the plane can and should be accomplished by the stevedores by standing away and taking hold of the wings; in short, that it was not necessary for Luehr to take hold of the landing gear

underneath the wing. We do not so understand the record. While there is considerable lack of clarity in the statements of witnesses as to the customary or proper practice at this final stage of the landing operation, there is much testimony to the effect that what Luehr did here was proper and unavoidable. As phrased by the walking boss of the stevedores, "you can't land that plane unless you get under it." Twenty-five witnesses were called. With one exception all testified orally, and broad scope must be conceded the trial judge in evaluating the testimony bearing on the subject.

During the trial the government introduced a manual entitled "Pacific Coast Marine Safety Code," the same being a part of the contract between the stevedore union and the employers. Rule 901 states: "Sling loads shall not be held suspended over men's heads." Rule 911 of the Code reads: "When assisting to steady in hoisting or landing a sling load, longshoremen shall not stand in the line of travel of the load nor between the load and any nearby fixed object and shall always face the load. Drafts should be lowered to shoulder height before longshoremen take hold of them for steadying or landing."

There is persuasive evidence in the record that these Rules are limited to ordinary "sling loads," and have no reference to "heavy lifts" or loads such as a plane fuselage. A Mr. Davis, a safety expert who was the technical advisor when the Rules were promulgated, testified that an airplane attached to a line so it can be lowered on a mechano deck is not a sling load.[1]

The point is without merit.

The court awarded libelant the lump sum of $125,000 to cover both special and general damages. The government

<hr/>

[1]. It is unnecessary to determine what significance such rules would have if apposite. Ordinarily, it would seem that while company safety rules are admissible a violation of them would not constitute negligence per se. It would still remain a question of fact whether conduct under given circumstances constituted negligence. Cf. Powell v. Pac. Electric Ry. Co., 35 Cal.2d 40, 216 P.2d 448; Simon v. City and County of San Francisco, 79 Cal.App.2d 590, 598, 180 P.2d 393; compare The Winnipeg, 9 Cir., 199 F.2d 80.

claims that the award is grossly excessive.

Ordinarily an accident of the sort which befell the libelant would have produced instant death. The plane, weighing several tons, dropped directly upon him "as though the falls were cut," bouncing a foot in the air after striking the mechano deck, crushing the man against the deck, and hurling him to the main deck 12 feet below. The injuries suffered took such terrific toll that the victim is and will continue for the rest of his life to be maimed and crippled, unable to pursue his former occupation or any occupation requiring physical labor —the only kind of calling for which he appears qualified. The court's finding

XI, as to the correctness of which there is no substantial disagreement, is illuminating, and we quote it on the margin.[2]

As of the time of the trial the medical expenses amounted to $7,322.32. It was then undisputed that the libelant needed further and continued treatment and attention, the court finding that he "will be caused to incur expenses for medical, surgical and hospital treatment in the future and will require medical attention the rest of his life." It appears that medical bills accruing since the trial amount to approximately $4,740, and as indicated in the findings the cost of medical care and expense will continue to mount indefinitely in the future. On the basis of experi-

2. "It is true that libelant was hospitalized for a period in excess of 100 days immediately following his injuries and that various life saving methods were employed in order to save his life, including blood transfusions, catheters in his bladder, rectal tubes and enemas, intravenous feeding, antibiotics and other methods. It is true that libelant developed osteomyelitis of the left tibia which has required six surgical operations to date and various skin grafts and other treatment. It is true that libelant has been under the continuous treatment of a physician and surgeon from the time of said injury until the date hereof and is still undergoing active treatment.

It is true that libelant has suffered permanent injuries as follows:

1. Spinal injuries which will require surgical fusion of the spine, which may relieve libelant of some future pain, but which will leave him with a permanent, serious and extensive spinal disability.

2. Spinal cord injury, resulting in scar tissue in spinal cord, which has left the spinal cord in a permanently damaged condition.

3. An active and still present osteomyelitis of the left tibia, which will require further surgical intervention and which osteomyelitis will remain as a permanent disability.

4. A portion of the anterior cortex of libelant's left tibia has been removed and libelant's left leg has been permanently shortened.

5. Traumatic arthritis of the left hip which will remain as a permanent disability.

6. Traumatic arthritis of the right ankle which will remain as a permanent disability.

7. A demineralization of the bones of the left hip, right ankle and left tibia.

8. Fractures of the left fibula which have not united and will not unite at the upper end and have united tenuously with overriding at the lower end.

All of the said injuries caused the libelant to suffer severe and excrutiating pain, suffering, distress, humiliation and anxiety and have caused libelant to lose much sleep and rest. Said permanent injuries to libelant's spine, back, left hip, left leg and right ankle presently cause and will in the future cause libelant severe, extreme and excrutiating pain, suffering, distress, anxiety and humiliation, and the operations which libelant will be forced to undergo in the future will cause him severe and extreme pain, suffering, worry, distress and anxiety.

It is true that libelant will be required to undergo active medical treatment for a period of approximately fifteen months after the date hereof and will have to be treated medically for the remainder of his life for said injuries.

It is true that libelant is permanently and completely disabled for any kind of physical labor, but may possibly at some uncertain future date be able to engage in some type of sedentary occupation, requiring his brain rather than his physique. Libelant is untrained and unqualified for any kind of work other than physical labor.

Libelant was born on March 11, 1899, and at the time hereof is 53 years of age, with a life expectancy of between 20 and 21 years."

ence thus far it seems not unlikely that in the end the total of this one item will exceed $20,000.

▉▉▉ The judge found that had Luehr been able to work during the period of his disability he would have earned about $7,500 as of the time of the trial, the finding being based on average earnings of longshoremen—$87.00 a week—in the Port of San Francisco during the period.[3] Assuming, as the court did, a life expectancy of 20 or 21 years, and making allowance for a progressive decline in earning capacity beyond age 65, counsel for libelant argue a demonstrable wage loss over the entire period of $78,000. Government counsel's figures are about half that amount. Such computations necessarily involve a high degree of speculation, but there are aspects of the situation on which one need not speculate. The court judicially knows that the value of the dollar continues to decline and that wages, including the wages of longshoremen, steadily pursue their ascending spiral. In the present case, too, the item of pain and suffering bulks larger than in the ordinary personal injury case and warrants correspondingly greater consideration. We know of no standard by which to measure compensation for pain and suffering. On the whole we are not persuaded that the trial court's award is excessive. What the court's function would be had such conclusion been reached it is unnecessary to inquire.

A further point requires brief notice. The Stevedoring Company's insurance carrier made certain advances to Luehr prior to the trial amounting to several thousand dollars, and provided some medical services in addition. The government asks that this court reduce the award by these amounts on the basis of an anti-subrogation agreement it has with the employer. The issue was not raised or litigated below, and the final decree reserves to the United States such rights, if any, as it may have to proceed against Jones Stevedoring Company "for

any amounts compensable under the Longshoremen's and Harbor Workers' Act [33 U.S.C.A. § 901 et seq.] insurance policies by reason of the waiver of subrogation agreement." The point appears to be one for disposition through further proceedings below.

Affirmed.

---

3. The accident occurred July 28, 1950, and the trial was had in March 1952.