Leland R. COOK, James Richie, John F. Price, Lonnie Gigers, Kelly May, A. L. McDonald, I. R. A. Saville, Isom McMoore, J. O. McDonald, Rufus Pettis, Hopson Wilson, Theodore Wright, I. B. Woods, Curtis G. Neal, Appellants,

v.

BROTHERHOOD OF SLEEPING CAR PORTERS, an unincorporated association, T. D. McNeal, Vice-President, Brotherhood of Sleeping Car Porters, Guy A. Thompson, Trustee, Missouri Pacific Railroad Company, Debtor, and Missouri Pacific Railroad Company, a Missouri corporation, Respondents.

No. 45783.

Supreme Court of Missouri, Division No. 2.

Jan. 13, 1958.

Motion for Rehearing or to Transfer to Court en Banc Denied Feb. 10, 1958.

Victor Packman, Irl B. Baris, Henry D. Espy, St. Louis, Joseph C. Waddy, Washington, D. C., of counsel, for appellants.

Clif. Langsdale, Kansas City, for Brotherhood of Sleeping Car Porters, and T. D. McNeal, respondents.

Harold L. Harvey, St. Louis, for respondent, Missouri Pac. Ry. Co.

EAGER, Judge.

This is a suit in equity filed by fourteen employees of the Missouri Pacific Railroad Company who are designated for collective bargaining purposes as "Train Porters"; defendants are the Brotherhood of Sleeping Car Porters, T. D. McNeal, a Vice-President thereof, the Missouri Pacific Railroad Company, and Guy A. Thompson, its Trustee (who needs no longer be considered). Plaintiffs have been so employed for relatively long periods, and as such they have acquired considerable seniority. They allege that, although they are classed as "Train Porters," the majority of their duties "consists of head-end braking." That contention is a matter which has long given rise to controversy and litigation, both in court and before administrative tribunals (State ex rel. S. L. & S. F. Ry. v. Russell, 358 Mo. 1136, 219 S.W.2d 340), but we are concerned with it here, if at all, only as background material. More specifically, that concerns the proper craft classification of this group of employees. Concededly, as shown here, the defendant Brotherhood had long been certified by the National Mediation Board (Title 45 U.S. C.A. §§ 154, 155) as the bargaining representative of the craft of "Train Porters"; and the present transcript also shows that the Board had declined to recognize "Porter-Brakemen," as a separate craft or class. Consequently the plaintiffs, and perhaps others in like situation, were somewhat dissident members of the craft of "Train Porters"; they did not, at the times here in question, belong to the defendant Brotherhood, although concededly represented by it for bargaining purposes. While perhaps it is immaterial, the record shows that plaintiffs belonged to the International Association of Railway Employees (which will be referred to as the Association), sometimes described as a "rival union," and at least one of them was an officer of its local. That evidence was objected to by the plaintiffs; they do not rely here upon such membership as an exemption from membership in the Brotherhood under § 152, Eleventh (c) of the Act, as membership in a labor organization "national in scope." The status of such an organization must be previously determined and certified by the recognized tribunals. (Pennsylvania R. Co. v. Rychlik, 352 U.S. 480, 77 S.Ct. 421, 1 L.Ed.2d 480.)

Pursuant to Title 45 U.S.C.A. § 152, Eleventh (being the amendment of 1951 to the Railway Labor Act), and on January 31, 1951, the Brotherhood duly requested of the Missouri Pacific conferences for the purpose of negotiating a union shop agreement. Under date of March 9, 1953, a memorandum agreement was executed by these parties adopting the form of union shop agreement here involved; this, in fact, was a form of agreement similarly entered into by Missouri Pacific with certain other crafts. The agreement, which we shall usually refer to as "the contract," was to be effective from April 1, 1953, and it covered "the employees * * * represented by the Brotherhood * * *." In strict conformity to the statute, supra, the contract (§ 1) required that "all employes * * * subject to the rules and working conditions agreements between the parties hereto * * shall, as a condition of their continued employment * * * become members of the organization party to this agreement representing their craft or class within sixty calendar days of the date they first perform compensated service as such employes after the effective date of this agreement, and thereafter shall maintain membership in such organization; * * *." Section 4, also in conformity to the statute, provided that: "Nothing in this agreement shall require an employe to become or to remain a member of the organization if such membership is not available to such employe upon the same terms and conditions as are generally applicable to any other member, or if the membership of such employe is denied or terminated for any reason other than the failure of the employe to tender the periodic dues, initiation fees, and assessments (not including fines and penalties) uniformly required as a condition of acquiring or retaining membership. * * *" Section 5 provided the procedure for notice to the carrier of noncompliance, and for hearings, appeals, etc., by an employee who disputed his liability to discharge. The substance of these provisions will appear in the body of this opinion.

Plaintiffs (some or all) testified that they were not notified or consulted concerning the request for or negotiation of, the contract, and we may assume that none of them were; the testimony of defendant McNeal indicated that business meetings of the Brotherhood members were held (to which nonmembers were not invited), before or after the union shop agreement was requested, at which meetings the matter was discussed, but no vote was taken because the 1950 National Convention of the Brotherhood had instructed its proper officers to negotiate for such a contract with the Missouri Pacific. The local was represented by a delegate at that convention. It seems clear that none of the plaintiffs gave the Brotherhood any specific authority to execute the contract.

On or about March 13, 1953, the Brotherhood (and in the use of this term, where appropriate, we include also the local) sent to each of the plaintiffs a letter stating that a union shop agreement had been signed, effective April 1, 1953, and that all employees classed as Train Porters were required "to become and remain financial members" of the Brotherhood within the specified sixty-day period after its effective date or become subject to dismissal; much more detail was stated concerning initiation fees, dues, mode of payment, etc., and a copy of the contract was enclosed with each letter. On May 21, 1953, the Brotherhood again wrote (by registered mail) to each of the plaintiffs, calling his attention to the fact that he had failed to comply with the union shop agreement, and expressing the hope that he would become a member before June 1, 1953; in part these letters stated: "* * * You can become a member by carrying or mailing the $25 joining fee to Secretary-Treasurer Will Newton, 1021 W. 29th Street, Little Rock, Arkansas, or to the Brotherhood of Sleeping Car Porters, 11 N. Jefferson Avenue, St. Louis 3, Missouri, in time to reach either place before June 1, 1953.

"In the event you have not become a member before June 1, 1953, under the

terms of the Union Shop agreement, we will have no choice but to serve notice on the Missouri Pacific to terminate your employment and seniority under our working agreement. * * *"

On or about June 3, 1953, none of the plaintiffs having joined the Brotherhood, it notified the Missouri Pacific in writing, and separately as to each one, of the noncompliance of each such employee with the contract, and requested that he be duly notified by the carrier. Thereupon the carrier promptly notified each plaintiff of the receipt of that request, and of the fact that he was thereby subject to dismissal. Thereupon each plaintiff, by letter to the carrier, requested a hearing before its proper official, in conformity with the contract procedure; all such hearings were held during the summer of 1953, the respective plaintiffs appearing personally, transcripts of the testimony or statements were made, and the result in each case was that the employee was thereafter notified in writing that he had been found to be in noncompliance with the contract and thus subject to discharge. At these hearings, so requested by the plaintiffs and held during the summer of 1953, each and every plaintiff was offered an opportunity to join the Brotherhood then, upon its agreement to drop the dismissal proceedings (although the sixty-day period had expired), but each of them declined. Each of the plaintiffs thereafter notified the carrier, in due course, that he appealed from this decision to the carrier's chief personnel officer; such appeals were considered on the records and in accordance with the stated procedure of the contract, and the respective plaintiffs were all notified that after a review of the records the conclusion had been reached that they had failed to comply with the contract and that the decision appealed from was sustained. Various plaintiffs testified that they had sought permission at the respective hearings to be represented by an attorney who was then present with them, but that the attorney was either excluded from the room or was not allowed to participate.

Following the notifications of affirmance, each plaintiff requested of the carrier (August-September, 1953) the appointment of a "neutral" to decide the dispute, under the terms of § 5 of the contract. The parties being unable to agree on a neutral, the National Mediation Board appointed Judge John W. Yeager of the Supreme Court of Nebraska to act as such. Hearings were held by him on November 9, 10 and 11, 1953, and under date of November 17, 1953, Judge Yeager notified each plaintiff of his finding that such plaintiff had "failed to comply with the terms and conditions of the agreement and that the Missouri Pacific Railroad Company had become obligated to terminate" his employment and seniority. Other facts in connection with this phase of the matter will be mentioned later. It does not appear that plaintiffs took any further steps prior to the filing of this suit on November 24, 1953.

Between October 29 and November 4, 1953, all of the plaintiffs, respectively, sent by registered mail to the Brotherhood $25 money orders with accompanying letters typewritten and identical in form (except that the last paragraph was lined out in ink on three or four of them) as follows: "Herewith find enclosed United States money order in the amount of $25, in compliance with Union Shop Agreement entered into January 12, 1953, between Guy A. Thompson, Trustee, Missouri Pacific Railroad Company and Brotherhood of Sleeping Car Porters, with reference to employees ostensibly represented by your organization.

"Kindly advise the monthly dues and assessments and same will be forwarded.

"You are further advised that this payment is being made under protest and I reserve any and all legal rights that I may have."

Very promptly, and from November 3–5, 1953, the Brotherhood returned the remittances by registered mail with letters stating that a decision had been rendered by the carrier that the respective employees

had failed to comply with the provisions of Section 1 of the contract (the union shop membership requirement). This interchange occurred very shortly before the hearings before the neutral.

These plaintiffs had for years worked under collective bargaining agreements negotiated by the Brotherhood, although there had been considerable dissention among them with reference to their craft classification and representation. The record shows the filing by these plaintiffs (and perhaps others) of a prior suit in the Circuit Court of the City of St. Louis against the Missouri Pacific and various Railroad Brotherhoods alleging: a violation of their civil rights based on racial discriminations, and a conspiracy to that end; that they were in fact performing the services of brakemen and should be classified as such; and praying that their job rights and true classification be protected and that defendants be enjoined from exerting pressures to eliminate them from the operating services. The present Brotherhood defendant intervened in that case as the craft representative of the plaintiffs, alleging that the great majority of the Train Porters were members of it. By an amended petition the cause was later changed to one for damages only, and the suit is still pending. We merely mention this case in passing, because the proceedings therein by the defendant Brotherhood are urged as evidencing "hostility" on its part against the plaintiffs in the present litigation.

When the plaintiffs received the original notices of the execution of the union shop agreement they consulted counsel; they were advised to "go very slow" about joining the Brotherhood, as such action might prejudice their pending suit and because there was a question regarding the validity of the union shop agreement. By way of explanation of his subsequent action, one plaintiff stated: "I had a case pending in court and I wanted to test the strength of that case to see whether or not I had to join"; one or two others made similar statements. Their action in remitting the initia-

tion fees seven or eight months after the original notice, with the letters already described, was also taken upon advice of counsel, and the letters were prepared by counsel. The evidence concerning the advice of counsel in the first instance was admitted on behalf of the plaintiffs on the theory that it tended to show their "good faith".

The facts may differ slightly as to certain individual plaintiffs, but since no separate contentions are briefed, the foregoing will suffice for all. On these facts plaintiffs alleged: that the defendants had acted arbitrarily and illegally in seeking to forfeit their rights, jobs and seniority, and in violation of the Railway Labor Act and of all due process requirements; that all such acts were malicious, and that plaintiffs had no adequate remedy at law or by administrative or statutory remedies; that plaintiffs "have exhausted all administrative remedies available to them * * *," and that an actual controversy existed as to the legality of the union shop contract. Plaintiffs prayed: for injunctions against their respective discharges and any interference with their "job rights"; that defendants also be enjoined from enforcing the contract against the plaintiffs, and from requiring them to join the Brotherhood; and for damages, $5,000 actual and $100,000 punitive, as to each plaintiff. It will not be necessary to digest the answers, for they are sufficient to make up the issues on the matters to be discussed. Such other facts as may be necessary will be referred to in the course of the opinion.

In this situation the trial court held, after taking the case under advisement, that it should be dismissed "for lack of jurisdiction," and judgment was entered accordingly. After their motion for new trial was overruled, plaintiffs duly appealed. A restraining order issued by the trial court has been continued in force.

It will be wholly impossible to state in this opinion or to follow, as such, all the points and subpoints raised here by the appellants. Stated in substance, and as con-

solidated, they are: (1) that the court had jurisdiction to adjudicate the invalidity of the contract, it being directly attacked, and plaintiffs having no adequate administrative remedy; (2) that the union shop contract is void as to these plaintiffs, because not validly entered into as to them (without notice or opportunity to be heard) and because it is in violation of the statutory duty of the Brotherhood to act fairly and without discrimination as to all the employees it represents; (3) that the tenders made by plaintiffs before any actual, completed discharge, were legally good and should have been accepted, and that plaintiffs were actually denied membership "for reasons other than failure to tender" initiation fees and dues; (4) that the court had jurisdiction on general equitable principles to relieve against the forfeiture of discharge; (5) that the decision of the neutral was made out of time under the contract, and was therefore void; and (6) that all determinations under the contract should be and are subject to judicial review. The defendants assert generally: (a) that the case was properly dismissed for lack of jurisdiction because plaintiffs had not exhausted their administrative remedies under the Railway Labor Act, and specifically because exclusive, primary jurisdiction in such matters is conferred by Congress upon the National Railway Adjustment Board; and (b) that no timely or sufficient offers to join or tenders were made by plaintiffs, and that defendant carrier was required under the contract to discharge them.

In the enactment of the Railway Labor Act (Title 45 U.S.C.A. §§ 151–163) Congress committed to the tribunals there created a vast responsibility in the handling of labor relations in that field, which, because of its peculiar and technical aspects and the occasional overlapping of crafts therein, is widely divergent from industry generally. (See, for instance, comments in Pennsylvania R. Co. v. Rychlik, 352 U.S. 480, 77 S.Ct. 421, 1 L.Ed.2d 480.) By § 153 of the Act the "National Railroad Adjustment Board" was created and its organization and operations outlined in detail; by paragraph 1(i) of that section it is provided that: "The disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions, * * * shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes." By §§ 154 and 155 the National Mediation Board was established, and its functions set forth.

By an amendment to this Act effective January 10, 1951 (§ 152) it was provided: "Eleventh. Notwithstanding any other provisions of this chapter, or of any other statute or law of the United States, or Territory thereof, or of any State, any carrier or carriers as defined in this chapter and a labor organization or labor organizations duly designated and authorized to represent employees in accordance with the requirements of this chapter shall be permitted—

"(a) to make agreements, requiring, as a condition of continued employment, that within sixty days following the beginning of such employment, or the effective date of such agreements, whichever is the later, all employees shall become members of the labor organization representing their craft or class: *Provided,* That no such agreement shall require such condition of employment with respect to employees to whom membership is not available upon the same terms and conditions as are generally applicable to any other member or with respect to employees to whom membership was denied or terminated for any reason other than the failure of the employee to tender the periodic dues, initiation fees,

and assessments (not including fines and penalties) uniformly required as a condition of acquiring or retaining membership."

■■ As already noted, these plaintiffs pursued the procedure of hearings and appeals up to and including the decision of a neutral, all as provided in the union shop contract and as authorized by the Act, but they pursued the administrative remedies no further. Our first and primary question is one of jurisdiction. It is apparent that Congress has left only a minimum of responsibility (and jurisdiction) to the courts, State or Federal, in the field of railway labor relations. Order of Ry. Conductors of America v. Pitney, 326 U.S. 561, 66 S.Ct. 322, 90 L.Ed. 318. In various matters basically involving jurisdictional disputes the courts have declined to interfere or take jurisdiction, even where it is claimed by an individual or minority group that the carrier and a Brotherhood are discriminating in job assignments, seniority, etc. Slocum v. Delaware, L. & W. R. Co., 339 U.S. 239, 70 S.Ct. 577, 94 L.Ed. 795; Order of Ry. Conductors v. Pitney, supra; Spires v. Southern R. Co., 4 Cir., 204 F.2d 453; Brotherhood of Locomotive Firemen & Enginemen v. Central of Georgia Ry. Co., 5 Cir., 199 F.2d 384, certiorari denied 345 U.S. 908, 73 S.Ct. 648, 97 L.Ed. 1344; Starke v. N. Y., C. & St. L. R. Co., 7 Cir., 180 F.2d 569; Missouri-Kansas-Texas v. Randolph, 8 Cir., 164 F.2d 4, certiorari denied 334 U.S. 818, 68 S.Ct. 1082, 92 L.Ed. 1748. In some of those cases the plaintiffs had gone through the preliminary administrative steps, as here, but had not presented their grievances to the Adjustment Board. The courts held in those cases that exclusive jurisdiction was conferred on the Board in such matters. In the Spires case the court held that the Board had exclusive jurisdiction although the employees claimed to have been treated unfairly by an agreement made by their bargaining agent. In Slocum, the court held that a state court had no jurisdiction to enter a declaratory judgment and

that the jurisdiction of the Board to adjust such grievances and disputes was exclusive. The courts have likewise declined jurisdiction in controversies involving union shop contracts, and specifically where the plaintiffs, belonging to a rival union, have protested the requirement that they must join the designated bargaining union or Brotherhood, and have sought reinstatement when discharged for failure to join. United R. R. Operating Crafts v. Northern Pac. Ry. Co., 9 Cir., 208 F.2d 135, certiorari denied 347 U.S. 929, 74 S. Ct. 529, 98 L.Ed. 1081; United R. R. Operating Crafts v. Pennsylvania R. R., 7 Cir., 212 F.2d 938; United R. R. Operating Crafts v. Wyer, D.C.N.Y., 115 F.Supp. 359, affirmed 7 Cir., 205 F.2d 153, certiorari denied 347 U.S. 929, 74 S.Ct. 529, 98 L.Ed. 1081; Alabaugh v. Baltimore & O. R. Co., 4 Cir., 222 F.2d 861, certiorari denied 350 U.S. 839, 76 S.Ct. 77, 100 L.Ed. 748; Pigott v. Detroit, T. & I. R. Co., D.C. Mich., 116 F.Supp. 949, certiorari denied 347 U.S. 944, 74 S.Ct. 639, 98 L.Ed. 1092. In those cases also, the courts have held: that primary jurisdiction rests in the Adjustment Board which, alone, is authorized to determine questions of plaintiffs' compliance or noncompliance with the contract and the application of the contract to them; and also, that such cases do not involve unequal representation or hostile discrimination by the bargaining representative (United R. R. Operating Crafts v. Pennsylvania R. R., supra). And such a controversy is said to be a grievance or dispute which Congress has relegated exclusively to the tribunals created under the Railway Labor Act (United R. R. Operating Crafts v. Northern Pac. Ry., supra, 208 F. 2d 138), as a grievance " * * * arising in the performance of collective bargaining agreements * * *." In Wyer supra, it was said that such a dispute involved "the interpretation or application of agreements concerning * * * working conditions," within the meaning of § 153, subd. 1(i) of the Act, and that "union security" was a condition which was the "subject of agreement." And see, also, the Pigott

case, supra. The possibility of conflicts between court and administrative determinations is pointed out in Order of Ry. Conductors of America v. Southern Ry. Co., 339 U.S. 255, 70 S.Ct. 585, 94 L.Ed. 811. And it has been held repeatedly that the fact that a collective bargaining agreement may have an unfavorable effect upon certain individuals or a minority of the employees represented does not invalidate it or give jurisdiction to the courts, where such are based upon differences relevant to the purposes of the contract. Lewellyn v. Fleming, 10 Cir., 154 F.2d 211, certiorari denied 329 U.S. 715, 67 S.Ct. 45, 91 L.Ed. 620; Alabaugh v. Baltimore & O. R. Co., 4 Cir., 222 F.2d 861, certiorari denied 350 U.S. 839, 76 S.Ct. 77, 100 L.Ed. 748; Steele v. Louisville & N. R. Co., 323 U.S. 192, 203, 65 S.Ct. 226, 89 L.Ed. 173 (relied on strongly here by plaintiffs).

■■ We note again at this point that the Brotherhood was, at all the times in question, duly and properly certified as the bargaining agent of these plaintiffs. It is universally held that the courts have nothing to do with the determination of the proper bargaining agent. Switchmen's Union of North America v. National Mediation Board, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61; General Committee of Adjustment of Brotherhood of Locomotive Engineers, etc., v. Missouri-Kansas-Texas R. R., 320 U.S. 323, 64 S.Ct. 146, 88 L.Ed. 76; United Transp. Serv. Employees of America, C. I. O., ex rel. Walsh v. National Mediation Board, 85 U.S.App.D.C. 352, 179 F.2d 446; Hunter v. Atchison, T. & S. F. Ry., 7 Cir., 171 F.2d 594, certiorari denied Shepherd v. Hunter, 337 U.S. 916, 69 S.Ct. 1157, 93 L.Ed. 1726. The Brotherhood, as such, was given express authority by § 152 of the Act to negotiate and execute a union shop contract which would require all who were presently nonmembers to join within sixty days of its effective date. The exception permitted for those belonging to another labor organization "national in scope" was abandoned in this case in the amended petition, so we are not con-

cerned with the exception. Generally speaking, when the accredited bargaining agent executes a union shop contract (or other collective bargaining agreement) it is binding on all employees in the bargaining unit, whether members of the union or not. Atlantic Coast Line R. Co. v. Pope, 4 Cir., 119 F.2d 39; Lewellyn v. Fleming, 10 Cir., 154 F.2d 211, certiorari denied 329 U.S. 715, 67 S.Ct. 45, 91 L.Ed. 620; Elder v. New York Cent. R. Co., 6 Cir., 152 F.2d 361.

■ Plaintiffs' counsel insist that the court had jurisdiction here because plaintiffs are attacking the validity of the contract. We might hold that they are not, in fact, actually attacking its validity, but merely its application to them; but, since it may conceivably be said that they are attacking its validity *as to them,* we will discuss the question. They say that the contract was negotiated and executed without notice to them or any opportunity to be heard on the question. We find no requirement in the act or in the cases of such a notice to individuals. In McMullans v. Kansas-Okla. & Gulf Ry., Inc., 10 Cir., 229 F.2d 50, certiorari denied 351 U.S. 918, 76 S.Ct. 710, 100 L.Ed. 1450, it was held that notice to individual complaining conductors was not required when their bargaining agent and the carrier so amended the existing contract as to provide for compulsory retirement at age 70. In Estes v. Union Terminal Co., 5 Cir., 89 F.2d 768, and Hunter v. Atchison, T. & S. F. Ry., 7 Cir., 171 F.2d 594, certiorari denied Shepherd v. Hunter, 337 U.S. 916, 69 S.Ct. 1157, 93 L.Ed. 1726, cited by plaintiffs, the notices which those courts held should have been given were notices required to be given by the Adjustment Board itself under the very terms of the Act, and the cases involved Adjustment Board hearings.

The courts cannot write a requirement of notice into the Act, and so far as we can see none was required under the present circumstances. The record also indicates that, while the negotiations and proposed contract were discussed at busi-

ness meetings of the Brotherhood, no vote was necessary (or taken) because the National Convention of the last previous year had instructed that a union shop contract be negotiated with the Missouri Pacific. Under these circumstances it would be the rankest speculation to say that notice to these plaintiffs would have been of any benefit to them. The circumstances in Steele v. Louisville & N. R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173, distinguish it from the present case, as will appear later. Elgin, Joliet & Eastern Ry. Co. v. Burley, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886, involved the authority of a union to compromise, without notice, individual claims for accrued back pay or penalties, a matter which the court was careful to distinguish from those matters involving the creation or amendment of collective bargaining agreements, and from the making of an agreement settling for the future the meaning of an existing agreement under which a dispute had arisen; disputes of the latter types were held to be within the power and authority of the bargaining agent, under the terms of the Act, and the carrier may safely deal with the union on that basis (Elgin, supra, 325 U.S. loc. cit. 739–740, 65 S.Ct. loc. cit. 1297). Certainly our present case, in which the plaintiffs seek continued future employment by virtue of injunctions and court orders, involves the future relations between these parties and the carrier, and it may indirectly involve, perhaps, the future relations of other employees. This case does not involve merely past individual grievances. We hold that the contract was not invalidated as to these plaintiffs by the failure to give them notice.

■ Plaintiffs cite in this connection, and rely greatly upon the following cases: Steele v. Louisville & N. R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173; Graham v. Brotherhood of Locomotive Firemen & Enginemen, 338 U.S. 232, 70 S.Ct. 14, 94 L. Ed. 22; Tunstall v. Brotherhood of Locomotive Firemen and Enginemen, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187; Brotherhood of R. R. Trainmen v. Howard, 343 U.

S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283; Rolax v. Atlantic Coast Line R. Co., 4 Cir., 186 F. 2d 473; Mount v. Grand Int. Brotherhood of Locomotive Engineers, 6 Cir., 226 F.2d 604, certiorari denied 350 U.S. 967, 76 S.Ct. 436, 100 L.Ed 839; Dillard v. Chesapeake & O. R. Co., 4 Cir., 199 F.2d 948; Richardson v. Texas & N. O. R. Co., 5 Cir., 242 F.2d 230; Central of Georgia, Ry. Co. v. Culpepper, 209 Ga. 844, 76 S.E.2d 482; Brotherhood of R. R. Trainmen v. Luckie, Tex.Civ.App., 286 S.W.2d 712; Lamon v. Ga. Southern & F. Ry. Co., 212 Ga. 63, 90 S.E.2d 658. It is urged that the effect of these cases establishes such a discrimination here as to invalidate the present contract, at least as applied to these plaintiffs. The general effect of those cases is that the Act contemplates that the bargaining agent must act fairly as to all the employees whom it represents, so as not to sacrifice, discriminatorily, the rights of a minority; that, however, it may make valid distinctions where relevant to the purposes of the contract (Steele, 323 U.S. loc. cit. 203, 65 S.Ct. loc. cit. 232). As pointed out by Judge Parker in the Alabaugh case (222 F.2d, loc. cit. 866) the Steele, Tunstall and Howard cases involved discriminations made solely on account of race, matters which did not involve "collective bargaining." To that group of three cases may be added also the Dillard, Rolax and Richardson cases, supra, and the very recent case (not cited) of Conley v. Gibson, 355 U. S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80. In this group of cases, generally, various actions were taken by the unions which either displaced negroes from their jobs or relegated them to inferior positions solely on account of their race, and without any option or discretion allowed to them by which the result might be obviated; and in some of the cases the complaining parties were wholly prohibited from joining the offending union on account of their race. While it is impossible to discuss those cases individually, it was, and is, obvious that in all of them the distinctions made were not *relevant to the purposes* of the bargaining agreement. The courts found their juris-

diction in the terms and purposes of the Railway Labor Act, which they held to be violated, and, perhaps, from constitutional rights and restrictions also. There is no contention whatever here that the acts of which plaintiffs now complain were motivated by racial considerations. Counsel say that the language of these cases goes further than a mere condemnation of racial discriminations; perhaps so, but the condemnations certainly seem to be confined to distinctions and discriminations which are not " * * * relevant to the authorized purposes of the contract * * *." (Steele, 323 U.S., loc. cit. 203, 65 S.Ct. loc. cit. 232.) The distinction between those cases and one where the plaintiffs are merely required, by the contract and the express authorization of Congress, to join the Brotherhood within sixty days (though actually extended here) as a requirement of continued employment, is obvious. In Lamon and Luckie, supra, the courts held that they could determine the validity of a contract amendment or directive of the union. We have determined here that the issues raised do not invalidate the present contract. The Mount and Culpepper cases, supra, are sufficiently distinguishable upon their facts that they are not persuasive here.

■ Counsel also cite a small group of cases in which the courts have indicated that they would, in some circumstances, accept jurisdiction of an action at law for damages on account of a completed wrongful discharge. Transcontinental & Western Air, Inc., v. Koppal, 345 U.S. 653, 73 S.Ct. 906, 97 L.Ed. 1325; Donahoo v. Thompson, Mo., 291 S.W.2d 70, certiorari denied 352 U.S. 941, 77 S.Ct. 261, 1 L.Ed.2d 237; Moore v. Illinois Cent. R. R. Co., 312 U.S. 630, 61 S.Ct. 754, 85 L.Ed. 1089. As indicated in Slocum (339 U.S. 239, 70 S.Ct. 577, 94 L.Ed. 318) such is only true when the employee has accepted the discharge as final, has ceased to be or·claim to be an employee, and files his suit for damages only. Those cases involve no possible question of future relations. See Broady v.

Illinois Cent. R. R., 7 Cir., 191 F.2d 73. That is certainly not the situation here where the plaintiffs, in effect, seek reinstatement and continued employment. Also, in Missouri, the employee is required to exhaust his administrative remedies (Koppal and Donahoo, supra.) before seeking relief in the courts. A mere prayer for damages cannot change the character of the suit so as to give the courts jurisdiction. See United R. R. Operating Crafts v. Wyer, D.C.N.Y., 115 F.Supp. 359, affirmed 7 Cir., 205 F.2d 153, certiorari denied 347 U.S. 929, 74 S.Ct. 529, 98 L.Ed. 1081; Brock v. Brotherhood of Sleeping Car Porters, etc., D.C.La., 129 F.Supp. 849; 100 L.Ed. 1139. The court said, in the Wyer case, at 115 F.Supp., loc. cit. 365: " * * * and it is a fantastic thought that every employee who is discharged under a union shop agreement can run to Court about it."

■ So far as concerns any claimed right to be represented by counsel at the hearings before officials of the carrier, neither the Act nor the contract gives such a right. The Act does confer that right in hearings before the Adjustment Board. The initial hearings are informal; no plaintiff claimed that he was prevented from telling his full story. This action did not constitute a denial of due process. Broady v. Illinois Cent. R. R., 7 Cir., 191 F.2d 73. Nor does it otherwise give the courts jurisdiction. See, also, as ruling this· question: Butler v. Thompson, 8 Cir., 192 F.2d 831, 832; Roberts v. Thompson, D.C. Ark., 107 F.Supp. 775, 776.

■ Plaintiffs insist that they have no adequate administrative remedy, citing certain sections of the Act, the Steele case, supra, and two cases which deal merely in generalities on wholly dissimilar facts. The basic argument here is that the Adjustment Board consists of members chosen equally from the Brotherhoods and the carriers and that in no event could these plaintiffs get a fair and impartial hearing. We may not confer jurisdiction upon our courts by speculating upon the attitude, composition,

or probable findings of that Board. A similar argument was made and denied in State ex rel. St. Louis S. F. Ry. v. Russell, 358 Mo. 1136, 219 S.W.2d 340. See, also: Alabaugh v. Baltimore & O. R. R., 4 Cir., 222 F.2d 861; Johns v. Baltimore & O. R. Co., D.C.Ill., 118 F.Supp. 317, affirmed 347 U.S. 964, 74 S.Ct. 776, 98 L.Ed. 1107; United R. R. Operating Crafts v. Pennsylvania R. R. Co., 7 Cir., 212 F.2d 938; Missouri-Kansas-Texas R. R. v. Randolph, 8 Cir., 164 F. 2d 4, certiorari denied 334 U.S. 818, 68 S.Ct. 1082, 92 L.Ed. 1748. We cannot presume prejudice or bias in a congressionally created tribunal. And the plaintiffs may, in person or by attorney, present their own grievances to the Adjustment Board, if the Brotherhood is unwilling to do so. Spires v. Southern Ry., 4 Cir., 204 F.2d 453; Starke v. New York C. & St. L. R. Co., 7 Cir., 180 F.2d 569. The Board has the power to order reinstatement as well as to grant money awards. Order of Ry. Conductors v. Pitney, 326 U.S. 561, 66 S.Ct. 322, 90 L.Ed. 318. Many of the cited cases hold that the courts may not assume jurisdiction when the complaining parties have not exhausted their administrative remedies. Alabaugh v. Baltimore & O. R. R., 4 Cir., 222 F. 2d 861, certiorari denied 350 U.S. 839, 76 S.Ct. 77, 100 L.Ed. 748; Johns v. Baltimore & O. R. Co., D.C.Ill., 118 F.Supp. 317, affirmed 347 U.S. 964, 74 S.Ct. 776, 98 L.Ed. 1107; Spires, supra; Slocum v. Delaware L. & W. R. Co., 339 U.S. 239, 70 S.Ct. 577, 94 L.Ed. 795; Brotherhood of Locomotive Firemen & Enginemen v. Central of Georgia Ry. Co., 5 Cir., 199 F.2d 384, certiorari denied 345 U.S. 908, 73 S.Ct. 648, 97 L.Ed. 1344; Bell v. Western Ry. of Alabama, 228 Ala. 328, 153 So. 434; Donahoo v. Thompson, Mo., 291 S.W.2d 70, certiorari denied 352 U.S. 941, 77 S.Ct. 261, 1 L.Ed.2d 237. In fact, substantially every decision in which the court has declined jurisdiction has been based upon the holding that jurisdiction was relegated by Congress to the administrative agencies, which is merely another way of saying the same thing. The Alabaugh case involved a union shop agreement and the contemplated discharge of certain members of "U. R. O. C." because they had declined and failed to join the certified bargaining agent when required. They had pursued the administrative procedure before officials of the carrier, as was done here. In their suit to enjoin the discharge they alleged discrimination on the part of the Brotherhood in refusing to reinstate them upon request. Their suit was dismissed, the court holding that they were required to exhaust administrative remedies before the Adjustment Board "which has been given by Congress primary original jurisdiction over controversies of this sort. * * *" The court further said, 222 F.2d loc. cit. 864: "The case here involves the rights of employees under a union shop agreement arrived at by collective bargaining. The interpretation of that agreement and the rights and grievances of employees thereunder are just the sort of matters that Congress intended to be handled in the first instance by the National Railroad Adjustment Board." The court there discussed various cases, many of which we have discussed or cited here; and it expressly distinguished that group of cases involving discriminations based on race. Counsel here seek to distinguish the Alabaugh case on its facts and issues; there are differences, of course, but its basic holding (and that of many of the other cases discussed) is applicable here; it is true that no issue of the validity of the contract was expressly raised there, but we have ruled that question here, independent of the Alabaugh decision. Space does not permit us to discuss the various other asserted distinctions, but they have been considered.

The point made that the "tender" of plaintiffs, made before completed discharge, was sufficient and that they were, in fact, denied membership in the Brotherhood for other reasons, is a matter which must be considered in administrative proceedings. The same is true of the contention that the decision of the "neutral" was void because not rendered within the time required by the contract. These are matters directly concerning the interpretation of the contract provisions and its application to these

plaintiffs; they require the consideration of evidence, and they certainly constitute the type of disputes which are expressly delegated to the Board.

The contention that the court has the power, on general equitable principles, to enjoin the forfeitures of discharge, really adds nothing to the contentions already discussed. If the court does not have *jurisdiction,* because of a controlling Act of Congress, it cannot act on the merits on any principles, legal or equitable. In fact, many of the cases already discussed in which jurisdiction was declined, were cases in equity where the complainants sought to enjoin a discharge or to attain reinstatement. This is certainly not a situation where a contract is void and unenforceable on its face. The contention cannot be sustained.

The constitutionality of the 1951 union shop amendment to the Act has been considered and upheld. Railway Empl. Dept., AFL, v. Hanson, 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112; Otten v. Staten Island Rapid Transit Ry., 2 Cir., 229 F.2d 919, certiorari denied 351 U.S. 983, 76 S.Ct. 1049, 100 L.Ed. 1497. And see the general discussion in Pennsylvania R. Co. v. Rychlik, 352 U.S. 480, 77 S.Ct. 421, 1 L.Ed.2d 480. Counsel have also urged that the Brotherhood, in and by this contract, wrongfully bargained away other rights of employees, such as the elimination of certain provisions of the existing "Rules and Working Conditions Agreement" in all cases arising under the union shop provisions. These things are not involved on our facts and it would be wholly inappropriate for us to consider or rule the contention. We cannot search this contract from end to end for some abstract "illegality."

Finally, counsel urge that all administrative determinations under the union shop contract should be subject to judicial review, because plaintiffs' property rights have been affected. The simple answer to that argument is that plaintiffs have not fully exhausted their administrative remedies and there is no Board decision which could be reviewed. We note, in pass-

ing, that at least a serious doubt arises from the cases as to whether any such right of review exists. Switchmen's Union of North America v. National Mediation Board, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61; United Transp. Serv. Employees of America, C. I. O., ex rel. Walsh v. National Mediation Board, 85 U.S.App.D.C. 352, 179 F.2d 446; Pennsylvania R. Co. v. Rychlik, 352 U.S. 480, 77 S.Ct. 421, 1 L.Ed.2d 480. The mere fact, urged by counsel, that certain provisions of the contract seem to contemplate possible court action, cannot create jurisdiction in the courts, by way of review or otherwise. The parties may not by agreement foreclose the jurisdiction of the courts, it is true, but neither may they create it.

Having determined that the contract was not invalid, and that neither the trial court nor this court had or has any jurisdiction to proceed beyond that determination, the order and judgment of dismissal for lack of jurisdiction is affirmed.

All concur.